**C.P. SMITH, Plaintiff,**

v.

**ARMOUR PHARMACEUTICAL COMPANY; Miles, Inc.; Hyland Division Baxter Healthcare Corporation, successor to Hyland Therapeutics Division Travelnol Laboratories, Inc.; and Alpha Therapeutic Corporation, Defendants.**

No. 93–10037–Civ.

United States District Court, S.D. Florida.

Nov. 18, 1993.

Robert E. Turffs, Kanetsky, Moore & De-Boer, P.A., Venice, FL, Ross M. Goodman, Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, FL, Judith S. Kavanaugh, Earl, Blank, Kavanaugh & Stotts P.A., Sarasota, FL, for plaintiff.

Edward W. Gerecke, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Douglas F. Fuson, Sidley and Austin, P.A., Chicago, IL, for Armour.

Duncan Barr, O'Connor, Cohen, Dillon & Barr, P.A., San Francisco, CA, Charles Goodell, Jr., Goodell, Devries, Leech & Gray, P.A., Baltimore, MD, Patricia E. Lowry, Steel, Hector & Davis, P.A., West Palm Beach, FL, for Miles, Inc.

Kathleen A. Touby, Touby, Smith, Demahy & Drake, P.A., Miami, FL, Richard L. Berkman, Dechert Price & Rhoads, Philadelphia, PA, for Baxter.

Carolyn A. Pickard, Herzfeld and Rubin, Miami, FL, David I. Bell, Knapp, Peterson & Clarke, P.A., Glendale, CA, for Alpha.

## ORDER GRANTING DEFENDANT MILES' MOTION TO STRIKE ALL REFERENCES TO THE "ED CUTTER MEMORANDUM" AND MOTION FOR PROTECTIVE ORDER

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on Defendant Miles' Motion to Strike All References to the "Ed Cutter Memorandum" and Motion for Protective Order, filed August 18, 1993. (D.E. # 43). Plaintiff filed a Memorandum in Opposition to Defendant Miles' Motion to Strike on September 3. (D.E. # 53). On that same day, Plaintiff filed a Notice of Supplemental Authority in Opposition to Defendant Miles' Motion to Strike. (D.E. # 52). On September 10, Defendant Miles filed a Reply to Plaintiff's Opposition to its Motion to Strike. (D.E. # 55). Defendant Miles on September 13 filed a Response in Opposition to Plaintiff's Notice of Supplemental Authority. (D.E. # 57). On that same day, Plaintiff filed a Second Notice of Supplemental Authority in Opposition to Defendant Miles' Motion to Strike. (D.E. # 58). Defendant Miles on September 16 filed a Response in Opposition to Plaintiff's Second Notice of Supplemental Authority. (D.E. # 60). On September 27, Plaintiff filed a Reply to Miles' Response in Opposition to Plaintiff's Second Notice of Supplemental Authority. (D.E. # 70). On October 25, Plaintiff filed a Third Notice of Supplemental Authority. (D.E. # 87). And on November 1, Plaintiff filed a Fourth Notice of Supplemental Authority. (D.E. # 94). Defendant

Miles on November 8 filed a Response in Opposition to Plaintiff's Third Notice of Supplemental Authority. (D.E. # 97).

At issue is whether the "Ed Cutter Memorandum" is currently covered by the attorney-client privilege.

## I. Factual Background

This is a suit filed by a hemophiliac who allegedly contracted HIV (the AIDS virus) from blood clotting products manufactured by Defendants. Numerous similar suits have been instituted against one or more of these same defendants. In one of those similar suits, *Keller v. Cutter Laboratories, Division of Miles, Inc.*, No. 88–14059–CIV–RYSKAMP (S.D.Fla. Nov. 6, 1989), outside counsel for one of the defendants, Miles, Inc. ("Miles"), inadvertently included a memorandum in a document production for the plaintiffs in that suit. That document was a memorandum from Ed Cutter, in-house counsel of one of Miles' subsidiaries known as Cutter Laboratories. The "Ed Cutter Memorandum" (the "Memorandum") had been distributed to several managers of Cutter. The Memorandum stated that although very little was known about AIDS and the relationship Cutter's products had in causing the syndrome, "litigation is inevitable". The Memorandum consequently recommended several specific steps to "demonstrate diligence in passing along whatever we do know to the physicians who prescribe the product."

When Miles discovered that opposing counsel in that case was in possession of this document, it immediately acted to prevent its use and distribution. Counsel for both sides stipulated that the document would be neither used nor distributed (except for being able to question original recipients about it). The court issued an order confirming the stipulation and requiring the plaintiff's counsel to petition the court for permission if he wanted to show the document to anyone other than a Cutter employee.

The plaintiff's attorney in *Keller* was also serving as counsel to plaintiffs in a similar case, *Ray v. Cutter Laboratories, Division of Miles, Inc.*, 746 F.Supp. 86 (M.D.Fla.1990). The attorney or his office disclosed the document to an expert witness and to the media.

The attorney claims that when he disclosed the document, he was acting as counsel in the *Ray* case, not the *Keller* case; this distinction was questioned skeptically by the *Keller* court in a hearing on Miles' subsequent Motion for Sanctions. The Motion for Sanctions against this attorney is currently pending in the *Keller* case.

Since the apparently unauthorized disclosure of the Memorandum, the contents of the Memorandum have become widely known. Various plaintiffs in independent actions against Miles have sought to make use of the document, and accounts of the Memorandum have been published in a variety of newspapers from Alaska to Florida.

In all of the actions where the plaintiffs have sought to make use of the document, Miles has challenged the use of this document with generally unfavorable results. One court found that the document was not at any point covered by the attorney-client privilege. All other courts found that the document had been privileged originally, but most held that the privilege had been waived or otherwise eliminated by one means or another. One court found that the wide publication of the document in newspapers across the country had eliminated any claim that the document remained confidential. Another court held that Miles' defense to reporters, in which it made references to the document, essentially waived the privilege that the document had previously enjoyed. And still another court held that Cutter had been responsible for the disclosure because it had exercised inadequate supervision of the discovery process. Finally, some courts gave no reasons for their denial of Defendant Miles' motion to strike. Plaintiff's Memorandum in Opposition cites these decisions of other courts and generally focuses on the fact that the Memorandum is now part of the public record and the fact that Cutter further waived any claim to confidentiality when it defended the contents of the Memorandum in interviews with the news media.

For the reasons set forth below, this Court holds that the "Ed Cutter Memorandum" is a document that originally was covered by the attorney-client privilege and that the Memo-

randum is still so covered because the privilege was not intentionally waived by Miles.

## II. Was the Memorandum Ever Protected by the Attorney–Client Privilege?

With one exception, all courts considering this matter have concluded that the "Ed Cutter Memorandum" was, indeed, originally protected by the attorney-client privilege. The Memorandum was written by the in-house counsel of Cutter and is specifically addressed to the inevitability of litigation. The attorney writing the Memorandum was writing from the legal, rather than scientific, perspective.

## III. Has the Privilege Been Lost Because of Public Circulation of the Contents of the Memo?

■ In its Memorandum in Opposition to Defendant Miles' Motion to Strike, Plaintiff places great emphasis on the wide circulation of the Memorandum's contents. He stresses that the Memorandum "has become a matter of general public knowledge", and that "it is available from other public sources", including newspaper articles. However, the wide circulation of the Memorandum provides insufficient grounds, by itself, for revoking the document's privilege.

■ Recognizing that, in practical terms, the contents of the document are no longer confidential is different from ruling that, in legal terms, the client holding the privilege has lost the privilege because someone else disclosed the document to the public. In Florida, for a privileged document to lose that status, it must be found that the holder of the privilege intentionally waived his rights. In the case of the attorney-client privilege, it is the client who holds the privilege and who must be found to have intentionally waived his rights. The fact that the contents of the document have become widely known is not dispositive of the legal privilege attaching to the document.

Plaintiff apparently is arguing the traditional Wigmorian view of privilege, and in so doing, Plaintiff misapprehends the law of Florida. The traditional Wigmorian view of privilege held that once the contents of the subject document had become public, regardless of the means by which this came about, the document's confidentiality and privilege had been destroyed. This strict view of the privilege was rejected by the Florida legislature when it enacted its statutes governing privilege. Critical language of Florida Statutes § 90.502(1)(c) is identical to that of Rule 503(a)(4) of the Proposed Federal Rules of Evidence. Both focus on intent and state that a communication "is 'confidential' if it is not intended to be disclosed to third persons." Rule 503(a)(4) of the Proposed Rules has been acknowledged as rejecting the Wigmorian view of privilege. *See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105–06 (S.D.N.Y.1985) ("The Proposed Rules ... reject Wigmore's 'strict responsibility' doctrine in favor of an 'intent' test").

This Court has held that counsel's inadvertent disclosure of privileged documents during discovery is insufficient by itself to constitute a waiver of the privilege. *Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 753 F.Supp. 936 (S.D.Fla.1991), *aff'd in part, question certified,* 991 F.2d 1533 (11th Cir. 1993). This Court held that in order for a waiver of the privilege to be found, the disclosure must have been intended by the client. *Id.* at 937–38. The Court further stated, "Although confidentiality can never be restored to a document already disclosed, a court can repair much of the damage done by disclosure by preventing or restricting use of the document at trial". *Id.* at 938 (citation omitted); *accord* Comments (Law Revision Council Note—1976) to Fla.Stat. § 90.508 (Addressing a situation where the contents of a confidential document have become publicly known because a court has erroneously compelled its production, the comments state, "While confidentiality, once destroyed, is not susceptible of restoration, prohibiting the use of privileged information is believed to afford some remedy for the holder's expectation of confidentiality").

Plaintiff quotes *Hamilton v. Hamilton Steel Corp.,* 409 So.2d 1111 (Fla.Dist.Ct.App. 1982), to say that "once the horse is out of the barn," it cannot be put back. However, the passage referenced by Plaintiff actually

states, "[O]nce the privilege is waived, and the horse is out of the barn, it cannot be reinvoked." The *Hamilton* case stands for the proposition that once the attorney-client privilege is found to have been waived, it cannot be reinstated; in the case at hand, this Court is addressing whether the privilege has been waived in the first place, and the Court holds that it has not been.

After all, what if a confidential memorandum is stolen from an attorney's office and subsequently published in newspapers across the country? Clearly, the client should not be held to have waived the attorney-client privilege. The fact that the contents of a privileged document have become widely known is insufficient by itself to eliminate the privilege that covers the document. Although in practical terms the document has lost any semblance of confidentiality, the Court in legal terms must recognize that the client has not intentionally waived the privilege. The law is clear; it is only the client who has the power to waive the attorney-client privilege. To hold that public circulation eliminates the privilege would, in effect, give *any* individual who secured a privileged document the power to waive the attorney-client privilege by simply having the contents widely recounted in newspaper reports.

### IV. Did Cutter Waive its Privilege By Speaking with the News Media?

Plaintiff points to one district court's ruling that Cutter's actions in discussing the contents of the Memorandum with the news media effectively waived the privilege that had previously existed. In *Roe v. Miles Laboratories, Inc.*, No. A89–098 Civil (D. Alaska April 10, 1991), the United States District Court for the District of Alaska held that although the contents of the memo had been privileged, Cutter effectively waived that privilege when it publicly commented on the substance and meaning of the document.

However, as is apparent on the face of the newspaper articles attached by Plaintiff, Cutter through its representative Bud Modersbach neither disclosed the existence of, nor the substantive contents of, the Memorandum. In fact, the uncontroverted assertion of Defendant Miles is that the reporter read the Memorandum verbatim to Modersbach, who then merely defended his company by explaining the limited scope of the Memorandum, that it was nothing more than a legal suggestion by an attorney unfamiliar with the scientific and other technical implications of his proposal. Clearly, such circumstances would not constitute a knowing waiver of the privilege through an intentional disclosure, as required by Florida statute.

In the context of a document's theft, as proposed above, should a client be prohibited from offering an exculpating explanation of the contents of the document when a reporter presents him with a copy? There is a large difference between, on one hand, disclosing the existence of, and contents of, a document and, on the other hand, merely trying to control the damage and extinguish the fire when one is presented with a copy of the document whose existence and contents have already become public knowledge. The circumstances of this case clearly implicate the latter of these alternatives. Cutter disclosed neither the existence of, nor the contents of, the Memorandum; the Memorandum had already been widely circulated. As one newspaper article characterized Cutter's statements, "A Cutter attorney downplayed the memorandum's importance." Tom Brennan, *Slip-up Reveals Memo Warning of AIDS Danger*, Tampa Trib., May 18, 1990, at 1A. In the face of public disclosure, Cutter should not be gagged for fear of waiving the privilege that would otherwise apply to the Memorandum.

### V. Has Cutter Waived the Attorney–Client Privilege By Exercising Inadequate Supervision Over the Discovery Process?

One trial court has held that the privilege had been waived because, *inter alia,* Cutter had failed to have in place "sufficient precaution mechanisms" to identify and remove the confidential document from the discovery production. *Ray v. Cutter Laboratories, Division of Miles, Inc.*, 746 F.Supp. 86 (M.D.Fla.1990). Plaintiff, however, has made no such allegation in his pleadings, other than to attach to his Memorandum in Opposition the decision of the *Ray* court. On the facts and allegations before this Court, there

is no indication that Cutter exercised inadequate supervision of the discovery process.

### VI. Does This Court Have the Power to Provide the Relief Requested By Defendant Miles?

■ This Court is clearly competent to make an independent assessment of whether the document at issue is covered by the attorney-client privilege—and it holds that the document is, indeed, privileged. However, the law is unsettled as to whether a court has the power to limit the use of documents obtained by means other than that court's discovery process.

■ The Second Circuit has held that, at least in the context of Rule 26(c) of the Federal Rules of Civil Procedure, a court may not issue a protective order with respect to data obtained through means other than the court's discovery process. *Bridge C.A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940 (2d Cir.1983). The Ninth Circuit adopted the same rule in *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074 (9th Cir. 1988). These cases, however, are factually distinguishable from the instant proceeding, and their holdings are more narrow than they have sometimes been portrayed. The Ninth Circuit in *Bridge C.A.T. Scan* held that a district court could not *prohibit the public disclosure* of information obtained prior to the commencement of the case before it. In *Kirshner*, the Second Circuit held that Rule 26(c) did not empower a district court to order a party *to return* privileged documents obtained through discovery in a separate action. Both of these cases address the power of a court to control the disposition of documents outside that court. In the instant case, this Court is asked simply to limit the use to which the document can be put *in the proceeding before this Court*. A court has much greater discretion to control the proceedings before it than it has to control the conduct of parties outside the courtroom. As one court recognized in issuing a protective order with respect to documents obtained through means other than the court's discovery process, a court has "inherent authority to control and preserve the integrity of its Judicial proceedings." *In re Shell Oil Refinery*, 143 F.R.D. 105, 109 (E.D.La.1992).

A bright-line rule prohibiting a court from regulating the use of information or documents obtained through means other than discovery in the pending proceeding would result in inequitable consequences and could undermine the integrity of a court's judicial proceedings. Suppose a plaintiff burglarized a defendant's premises and secured privileged documents. Could one seriously contend that a court could not prohibit the use of those documents in the proceeding pending before it simply because the documents were not obtained through the court's discovery process? *Bridge C.A.T. Scan* and *Kirshner* stand for the proposition that the court in such a situation could not issue a protective order preventing the plaintiff from disclosing the information to the public or compelling the plaintiff to return the documents to the defendant (*i.e.*, controlling the documents outside the court); but these cases would not prohibit a court from exercising its equitable powers to control, and preserve the integrity of, its judicial proceedings by limiting the use to which the documents could be put in the proceedings pending before the court.

### VII. Conclusion

The "Ed Cutter Memorandum" was originally protected by the attorney-client privilege, that privilege was never waived, and this Court has the power to protect the integrity of its judicial proceedings by limiting the use to which the document can be put. Accordingly, after a careful review of the record, and the Court being otherwise fully informed in the premises, it is

ORDERED, ADJUDGED, and DE-CREED that Defendant Miles' Motion to Strike All References to the "Ed Cutter Memorandum" and Motion for Protective Order be, and the same is hereby, GRANTED. All references to the "Ed Cutter Memorandum" will be ignored by the Court, and Plaintiff is prohibited from citing the Memorandum in the future course of this litigation.

DONE and ORDERED.