**In re SOUTHEAST BANKING CORP. SECURITIES AND LOAN LOSS RESERVES LITIGATION.**

**William A. BRANDT, Jr., Trustee of Southeast Banking Corporation, and derivatively on behalf of the Federal Deposit Insurance Corporation, as Receiver of Southeast Bank, N.A., and of Southeast Bank of West Florida, Plaintiff,**

**v.**

**FEDERAL DEPOSIT INSURANCE CORPORATION; Director, Office of Thrift Supervision; Resolution Trust Corporation; Deloitte & Touche; Ernst & Young; and Federal Deposit Insurance Corporation, as Receiver of Southeast Bank, N.A., and of Southeast Bank of West Florida, Defendants.**

**No. 95–2602–CIV.**

United States District Court, S.D. Florida, Miami Division.

Aug. 1, 1997.

---

Edward A. Moss, Anderson, Moss, Sherouse & Petros, Miami, FL, for William A. Brandt, Jr.

Patrick McGlone, F.D.I.C., Washington, DC, for F.D.I.C.

Neal Russell Sonnett, Sonnett, Sale & Kuehne, P.A., Geoffrey C. Hazard, Jr., Philadelphia, PA , for J. Joseph Bainton.

### ORDER

EDWARD B. DAVIS, Chief Judge.

THIS MATTER is before the Court on the Trustee's appeal from Magistrate Judge Garber's June 25, 1996 Order. In this order, Magistrate Judge Garber granted Defendant FDIC's Motion for Return of Inadvertently Produced Privileged Documents and for Sanctions Against Counsel. Specifically, Magistrate Judge Garber (1) required Plain-

tiff to identify all post-closing documents in his possession and return them to the FDIC; (2) prohibited Plaintiff from using any of the post-closing documents or the information contained therein; (3) rescinded Mr. Bainton's *pro hac vice* status in this Court; and (4) granted Defendant's request for attorneys' fees. After reviewing the parties' filings and hearing oral argument, the Court AFFIRMS Magistrate Judge Garber's Order on all grounds *except as to* the rescission of Mr. Bainton's *pro hac vice* status.

Mr. Bainton properly objects to the rescission of his *pro hac vice* status on the grounds that he was not afforded notice nor a hearing on this issue.[1] The Eleventh Circuit has recognized that an attorney's *pro hac vice* status may not be denied nor revoked without "notice of the charge against him or an opportunity to explain [his conduct]." *Kirkland,* 884 F.2d at 1371 (quoting *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1211 (11th Cir.1985)).

Although Mr. Bainton was aware that his conduct was the subject of a motion for sanctions before Judge Garber, the Defendants' Motion for Sanctions did not explicitly inform counsel that his *pro hac vice* status was at issue. *See also* Transcript before Judge Garber at 82 (dated June 10, 1996) (seeking rescission of Mr. Bainton's *pro hac vice* status at the conclusion of the hearing).

Given the severity of this sanction and the due process issues at stake, this Court is obligated to remand this issue for further proceedings. Accordingly, it is

ORDERED AND ADJUDGED as follows:

(1) Magistrate Judge Garber's June 25, 1996 Order is AFFIRMED in all respects except as it relates to the rescission of Mr. Bainton's *pro hac vice* status; this issue is REMANDED to Magistrate Judge Garber for further proceedings consistent with this opinion.

(2) This case is REMANDED to Magistrate Judge Garber to make a determination of attorneys' fees and costs.

---

1. The Court notes that Mr. Bainton's withdrawal from this action does not render the rescission of his pro hac vice status moot. *See Kirkland v.*

*National Mortgage Network, Inc.,* 884 F.2d 1367, 1370 (11th Cir.1989).

(3) Magistrate Judge Garber shall continue to administer the safekeeping of the post-closing documents as necessary.

(4) Because the Court has prohibited Plaintiff's use of the post-closing documents and any information contained therein, the parties shall file a *joint status report* within twenty days from the date stamped on this Order, identifying the impact of this Order on this litigation.

### ORDER ON FDIC's MOTION FOR RETURN OF INADVERTENTLY PRODUCED PRIVILEGED DOCUMENTS AND TO PRECLUDE TRUSTEE FROM DISSEMINATION OR USE OF THOSE DOCUMENTS

GARBER, United State Magistrate Judge.

THIS CAUSE is before the Court on Defendant Federal Deposit Insurance Corporation's ("FDIC") motion seeking the return of certain "post-closing documents" to which it claims are subject to an attorney-client and work product privilege. The FDIC claims that both the Trustee William A. Brandt ("Trustee") and his counsel, J. Joseph Bainton took advantage of the inadvertent production of these privileged documents by surreptitiously copying them, and then intentionally concealing the misappropriation while at the same time litigating a turnover proceeding to gain access to the very documents already in their possession. The FDIC requests that this Court order return of the post-closing documents, prohibit the Trustee from using, disclosing, or disseminating any of the information contained therein, and that this Court impose sanctions against Mr. Bainton.

### BACKGROUND

In September 1991, Southeast Bank, N.A. ("SEBNA") and Southeast Bank of West Florida (collectively "the Banks") failed, and the FDIC was appointed as receiver. The day after the Banks closed, Southeast Banking Corporation ("SBC"), the Bank's holding company, filed for bankruptcy, and William

Brandt was appointed as the Trustee. The Trustee initiated various proceedings in the Southern District of Florida and sought access to the business records of the Banks, including the files of the Banks' and SBC's general counsel, Steel Hector & Davis (the "pre-closing documents"), asserting outright ownership of or joint privilege with respect to the pre-closing documents.[1] The Trustee and the FDIC disputed the scope and ownership of the Banks' attorney-client privilege; the Trustee claimed that as parent and sole shareholder of the Banks, SBC owned or at least shared the Banks' attorney–client privilege with the FDIC–Receiver. The FDIC–Receiver disagreed and sought to distinguish the nature of the services that Steel Hector & Davis had performed.

The Trustee filed a turnover proceeding against Steel Hector & Davis (in which the FDIC intervened), claiming ownership of or entitlement to all of their documents concerning the Banks. Eventually, the Trustee and the FDIC entered into stipulations, agreements, and protective orders regarding the production and use of the pre-closing documents. On March 23, 1993, the Court ratified a stipulation pursuant to which the Trustee dismissed the turnover action without prejudice. In these agreements, which only pertained to the pre-closing documents, the parties reserved their rights regarding ownership and privilege, and deferred all disputes concerning the documents until notice of intended disclosure to a third party. In addition, the Trustee and the FDIC expressly agreed that any inadvertent production of privileged documents would not constitute a waiver.

As part of the FDIC–Receiver's statutory responsibility, it investigated the Banks' officers, directors, attorneys, accountants, and other third parties to determine whether it should pursue any claims against those persons. As part of that investigation, the FDIC's staff and counsel created *the postclosing documents—several documents which evaluated various potential claims and referenced communications between the FDIC's*

---

1. The pre-closing documents are documents which were in existence on September 19, 1991 and belonged to the failed banks and their holding company. The post-closing documents are documents generally created by the FDIC after the banks were closed on September 19, 1991.

*investigators and attorneys.* In addition, there were other documents generated by the FDIC's staff and counsel concerning the lawsuits initiated by the Trustee. *Neither party disputes that these documents were protected by the attorney-client and work product privilege.*

When the Trustee learned of the existence of these postclosing documents, he requested that the FDIC produce them. After the FDIC refused to produce the documents, in March, 1994, the Trustee instituted a turnover proceeding in the Bankruptcy Court to obtain them. While that action was pending, production of the preclosing documents was taking place.

The first production of pre-closing documents took place in Orlando, Florida in February and April, 1994. Mr. Bainton was provided with an index to 944 boxes of pre-closing documents which he used to request access to various boxes. He was given one box at a time to review and he would mark certain documents for later copying. He then notified the FDIC–Receiver that he wanted to image onto CD ROM those documents which he had tagged for copying. Because the FDIC's Orlando office was scheduled to close, the imaging process was set to take place in Atlanta, where the FDIC's operations were being relocated.

During this time, other parties involved in the Southeast litigation sought access to the pre-closing documents. The Resolution Trust Corporation ("RTC") gained access to the documents directly from the FDIC–Receiver pursuant to an inter-agency sharing agreement, under which the two agencies agreed that their privileges were not waived with respect to the documents. The FDIC gave the RTC, through Robert W. Clark, a member of MacFarlane Ausley Ferguson & McMullen (attorneys for the RTC in *RTC v. Blumberg,* one of the cases in the MDL litigation), an index consisting of both pre and post-closing documents. From that index, the RTC selected which documents they wanted to copy.

After the first status conference in the multidistrict litigation held on September 28, 1994, Ms. Karen Wildau, outside counsel for the FDIC–Receiver, met with Mr. Clark and Mr. Bainton. Because several of the officer and director defendants in the RTC lawsuit were pressing Mr. Clark for access to those pre-closing records which the RTC had copied from the FDIC, and Mr. Bainton still insisted that the Trustee held a joint privilege in the documents, pursuant to the FDIC and Trustee's stipulations, they agreed to a privilege review by Mr. Bainton and the FDIC–Receiver of the pre-closing documents before the other parties in the litigation could gain access. Thus, Mr. Clark sent both Ms. Wildau and Mr. Bainton a copy of the over 400 page index of the documents in his possession. According to Ms. Wildau, the index appeared to be the very same index of pre-closing documents which had previously been produced to the Trustee, and she therefore declined to read it. In fact, this was the same index that was produced to the RTC pursuant to the inter-agency sharing agreement. Had Ms. Wildau read through it, she would have discovered that the index included several pages indexing some of the post-closing documents as well; however, without having studied the index, she recommended to the new in-house counsel for the FDIC–Receiver that the Trustee be permitted to conduct his privilege review of the documents listed in the index. Mr. Bainton did not advise Ms. Wildau that this index contained post-closing documents. Instead, on October 24–26, the Trustee was provided access to the documents in Mr. Clark's office in Tampa, *where he copied several post-closing documents.*

Because the Banks' documents were also being sought by the officer and director defendants in addition to the Trustee and the RTC, the FDIC decided to "Bates label" and review for privilege the pre-closing records, which by then consisted of 984 boxes, while they were located in the Spring Street warehouse in Atlanta (where they had been transferred to from Orlando). Each box of pre-closing documents was identified by a green neon dot and attached to it was an index listing the contents of the box. After the privilege review was complete, the boxes were transferred to the permanent warehouse locate on Fulton Industrial Boulevard in Atlanta.

The FDIC instructed the warehouse personnel to segregate and place only the pre-closing documents in the segregated caged area which had been set aside for the Trustee's imaging process. However, some of the post-closing documents were also placed into the caged area, as well. On November 28, 1994, Mr. Bainton arrived at the Fulton Industrial Warehouse with the imaging crew as previously arranged in order to copy the pre-closing documents previously tagged in Orlando. Mr. Bainton acknowledges that he noticed that there were additional boxes which included postclosing documents, documents which he had not seen before. "Before even looking at the documents it became apparent to counsel for the Trustee that there were boxes in the caged area to which they had not been given access in Orlando." (Trustee's Memorandum in Opposition to FDIC Motion for the Return of Documents at 9). He asked for the index, which listed these documents, and *immediately began to copy substantially all of the post-closing documents, despite the fact that they were conspicuously marked confidential and privileged, and that these were the same documents that the FDIC had adamantly and consistently denied the Trustee access to.*

On November 23, 1994, four days before the Trustee served his brief in opposition to the FDIC–Receiver's motions in the turnover litigation (the "Reply Brief") Mr. Bainton advised Ms. Wildau that she was "going to love" his Reply Brief, and that the FDIC had "hung itself out to dry." When Ms. Wildau received the Reply Brief, which was filed under seal, she realized that Mr. Bainton had attached as exhibits several of the post-closing documents. Ms. Wildau took steps to determine how the Trustee obtained these documents and how many others he had. After several letters and inquiries, and finally formal interrogatories, Ms. Wildau still had no answer from the Trustee as to where he obtained the documents. It was eventually determined that Mr. Bainton had copied those post-closing documents from Mr. Clark's office in Tampa, before he had been admitted to the Atlanta warehouse. By the time the FDIC learned of the error that boxes of post-closing documents were in the caged area of the warehouse and removed them, Mr. Bainton had already copied substantially all of the post-closing documents.

The FDIC contends that during the entire pendency of the turnover proceeding, the Trustee never disclosed that on two separate occasions, he had already copied most of the post-closing documents at issue in the proceeding. The FDIC–Receiver repeatedly requested return of the post-closing documents, however, the Trustee refused. Finally, the FDIC and the Trustee reached an agreement (the June 15, 1995 letter agreement) wherein the Trustee dismissed without prejudice the turnover proceeding and the parties agreed that the dispute over entitlement by the Trustee to keep, use or disclose the contents of the documents would be deferred until the Trustee chose to attempt to use or disclose the documents.

The Trustee used the post-closing documents to fashion the Complaint in this case against the FDIC, and he now desires to use the documents in depositions and other court proceedings, and make some of the documents available to the press. The FDIC urges this Court to order the Trustee to return the documents and prohibit any use of the same by the trustee, and to impose sanctions upon Mr. Bainton for his conduct. Mr. Bainton argues that the FDIC has waived its privilege by voluntarily producing the post-closing documents. He further argues that even if the privilege has not been waived, he is entitled to these documents under a joint-privilege theory. Finally, the Trustee asserts that he and his counsel, Mr. Bainton, have complied with their professional and ethical obligations.

## DISCUSSION

### 1. Waiver of Privilege

■ There is no dispute that the post-closing documents were originally protected by the attorney-client and work product privileges. The Trustee claims that the FDIC has not met its burden of showing non-waiver of the privileges and that the disclosure was truly inadvertent, rather than voluntary.

There are three approaches to determining waiver of attorney–client and work product privileges through inadvertent disclosure. The first approach is that inadvertent disclosure of a privileged document by an attorney is insufficient by itself to constitute a waiver because important rights may only be relinquished intentionally by the client. *Smith v. Armour Pharmaceutical Co.*, 838 F.Supp. 1573, 1576 (S.D.Fla.1993); *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 753 F.Supp. 936, 938 (S.D.Fla.1991). Other federal courts apply a balancing test which requires the court to make a case by case determination of waiver by weighing several factors, including the diligence of the party claiming the privilege to protect it, the extent of the disclosure, the measures taken to rectify the inadvertent disclosures, and the overriding interest of justice. *In re: Grand Jury Investigation*, 142 F.R.D. 276, 278 (M.D.N.C.1992); *F.D.I.C. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479 (E.D.Va.1991); *U.S. v. Pepper's Steel & Alloys, Inc.*, 742 F.Supp. 641 (S.D.Fla.1990). The third approach, which has been rejected by the Southern District of Florida in the above cited cases, is a blanket rule that inadvertent disclosure always causes a waiver of privilege. *See Intn'l Digital Systems Corp. v. Digital Equipment Corp.*, 120 F.R.D. 445 (D.Mass. 1988).

The Trustee cites *Ray v. Cutter Laboratories, Div. of Miles, Inc.*, 746 F.Supp. 86 (M.D.Fla.1990) for the proposition that Florida follows the traditional view that any disclosure, whether inadvertent or intentional, waives the privilege. However, the Court in *Ray* misconstrued the holding in *Hamilton v. Hamilton Steel Corp.*, 409 So.2d 1111 (Fla. 4th DCA 1982) on which it based its decision. In his partial concurring and dissenting opinion in *Kusch v. Ballard*, 645 So.2d 1035 (Fla. 4th DCA 1994), Judge Stevenson correctly notes that the *Ray* decision misread the holding the *Hamilton* case. In discussing the *Hamilton* decision, Judge Stevenson noted:

> The court held that once communications protected by the attorney-client privilege are voluntarily disclosed, the privilege is waived and cannot be reclaimed. Thus, it is quite apparent that *Hamilton* does not address the specific issue of inadvertent

disclosure by counsel of attorney-client information because the disclosure by counsel in *Hamilton* was clearly voluntary and intentional.

*Kusch*, 645 So.2d at 1039. Therefore, this Court finds that *Ray* is inapplicable in this case, and instead will adhere to the precedent set forth by this district in the *Georgetown* and *Smith* cases.

Under either the first or the second approach, this Court finds that the FDIC has not waived its privilege because of its counsel's inadvertent disclosure. In *Georgetown*, this Court found that the inadvertent disclosure made by the attorney, rather than the client to whom the privilege belongs, is not a waiver of the privilege. *Georgetown*, 753 F.Supp. at 939.

> We are taught from first year law school that waiver imports the "intentional relinquishment or abandonment of a known right." [footnote omitted] Inadvertent production is the antithesis of that concept.... [A client's] lawyer ... might well have been negligent in failing to cull the files of the letters before turning over the files. But if we are serious about the attorney-client privilege and its relation to the *client's* welfare, we should require more than such negligence by *counsel* before the client can be deemed to have given up the privilege. [emphasis in original]

*Georgetown* 753 F.Supp. at 938 (citing *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954 (N.D.Ill.1982)). In Smith, this Court reaffirmed that a counsel's inadvertent disclosure of privileged documents during discovery is insufficient by itself to constitute a waiver of the privilege. *Smith*, 838 F.Supp. at 1576.

■ In this case, the Trustee claims that the disclosure was not inadvertent, but rather voluntary, and that therefore, the FDIC waived the privilege. The Trustee claims that the post-closing documents were voluntarily produced, however, it is apparent to this Court that these documents were not voluntarily produced, rather it was an error. Common sense dictates that there was not a conscious decision on the part of the FDIC to

hand over the postclosing documents to the Trustee. These are the very documents which were the subject of the turnover proceeding which the FDIC was vigorously contesting. The Trustee acknowledges that the FDIC refused to produce the post-closing documents and that he was forced to institute a turnover proceeding in the Bankruptcy court to attempt to obtain them. However, in the next sentence, he asserts that the FDIC voluntarily produced certain of these postclosing documents at the documents production in October 1994 in Tampa and in November and December 1994 in Atlanta.

There is no evidence that reflects an intention by the FDIC to voluntarily give these documents to the Trustee. In fact, all of the evidence points to the conclusion that the FDIC was doing everything in its power to keep these documents confidential. It appears that it was through Ms. Wildau's error in failing to review the index which was forwarded to Mr. Bainton that Mr. Bainton gained access to the post-closing documents in Tampa. It also appears that the placement of the boxes of post-closing documents in the caged area of the Atlanta warehouse was through error of the staff in the warehouse. The record clearly shows that Mr. Bainton's purpose in going to Atlanta was to image those pre-closing documents which he had already tagged for copying in Atlanta, not to sift through any new documents which he had not yet seen. Mr. Bainton admits that he realized that there were extra boxes of documents to which he was not given access in Orlando. Mr. Bainton should have known this was not an intentional production of those documents, but rather a mistake on the part of the staff. However, Mr. Bainton chose not to alert the FDIC to the mistake or to confirm that he was permitted access to those documents. Instead, he chose to copy every post-closing document that he could get his hands on. Therefore, this Court is satisfied that the FDIC did not intentionally disclose its privileged documents, but that it was through its counsel's inadvertence that the Trustee gained access to and copied them.

Even under the balancing test as discussed in *Pepper's Steel*, it appears that the FDIC

had taken reasonable precautions in protecting its privilege. In *Pepper's Steel*, this Court noted that "mistakes of this type are likely to occur in cases with voluminous discovery. At best, these situations are resolved amicably, by counsel returning documents which are obviously privileged and inadvertently produced. It is unfortunate that such could not be the case here and that the Court was forced to expend a great deal of time on this ... matter." *Pepper's Steel*, 742 F.Supp. at 645.

The same sentiments hold true in this case. The discovery of just the pre-closing documents consisted of over 900 boxes which were thoroughly reviewed by the FDIC. The privilege review was effective for the Orlando production, as no post-closing documents were produced at that time. The FDIC did not fail in its precautions simply because the Trustee gained access to the documents in Atlanta. Special measures were taken to insure that no post-closing documents would be available to the Trustee, including separating the pre-closing documents into the caged area. Unfortunately, about 200 boxes containing post-closing documents were accidentally placed inside the caged area. However, Mr. Bainton knew that these were documents that the FDIC claimed were privileged and that he should not be in possession of. In addition, the measures taken were adequate under the circumstances where the Trustee's sole purpose in going to Atlanta was to image those pre-closing documents which he had previously tagged for copying in Orlando. Although the extent of the disclosures is considerable, the other factors outweigh a finding of waiver. *The Court finds that the FDIC took great care in attempting to secure their privileged documents, and that after it learned of the inadvertent disclosure, it immediately and persistently took steps to recover the documents.* The letter agreement settling the turnover proceeding represents the FDIC's interest in preserving the privileges in its documents and preventing any further disclosures. In addition, *this Court finds that the interests of justice would best be served by preserving the privilege in the post-closing documents.* This Court cannot and will not condone

both the Trustee and his counsel's behavior in obtaining these documents when they knew perfectly well that there was a dispute over their entitlement to them.

■ In addition, the FDIC argues that it protected its attorney–client and work product privileges by preserving them in the non–waiver provisions of the various agreements and protective order regarding the exchange of documents between the Trustee and the FDIC. The documents contain a provision wherein any of the parties agreed that "the production of documents, inadvertent or otherwise, or of indices is not a waiver by any party of any legitimate claim of privilege or confidentiality which the parties may wish to assert as between themselves or as against others."

The Trustee argues that the inadvertent disclosure clause in the agreements governing the pre-closing documents does not apply to the post-closing documents. This Court disagrees. The inadvertent disclosure of the post-closing documents occurred during the production of the pre-closing documents which were being produced pursuant to this agreement. A plain reading of the agreements shows that the non-waiver provisions were not limited to apply only to privileged pre-closing documents. It appears that this type of disclosure is what was contemplated by the parties when fashioning this agreement and that the FDIC and the Trustee agreed that the privileges would not be waived. Therefore, the parties' agreements should be enforced and the non-waiver provision be applied. *See Pepper's Steel,* 742 F.Supp. at 644.

### 2. Joint Privilege

■ The Trustee argues that he is entitled to use these documents even if the FDIC has not waived its privilege because as successor-in-interest to SEBNA, Southeast's wholly owned subsidiary, he shares the privilege with the FDIC. This Court disagrees. This is not a simple case between a parent corporation and its subsidiary or a shareholder suit against the corporation. This case con-

cerns a dispute between two entities created by statute, the FDIC as Receiver pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") and a Trustee in bankruptcy who acts pursuant to federal bankruptcy law. The Trustee does not cite any authority for his joint privilege claim under the circumstances involved in this case.

The Trustee argues that regardless of whether he and the FDIC are adverse to each other in this lawsuit, they both have common interests in the pre-closing operation of SEBNA and the determination as to who is responsible for the failure of the parent's principal subsidiary. However, this similar interest does not necessarily entitle the Trustee to a joint privilege in postclosing documents which are the work-product of the FDIC, and in which the trustee had no participation in preparing. In the past, the Trustee argued that because the officers and directors of the holding company and the Bank were virtually the same, and because the holding company was the sole shareholder of the Bank, he was entitled to assert derivative claims which FIRREA granted to the FDIC. This Court has ruled against him on this argument, rejecting his reliance on *Branch v. FDIC,* 825 F.Supp. 384 (D.Mass. 1993). *See In re Southeast Banking Corp.,* 827 F.Supp. 742, 750 n. 9 (S.D.Fla.1993), *affirmed,* 69 F.3d 1539. The Court found that the claims for mismanagement of SEBNA were derivative, and that pursuant to Title 12 U.S.C. § 1821(d)(2)(A)(i) (1981), derivative claims belong exclusively to the FDIC. *Id.* at 746.[2]

In addition, 12 U.S.C. § 1821(d)(2)(A)(i) provides that the FDIC succeeds to "all ... privileges of the insured depository institution and of any stockholder ... of such institution with respect to the institution and the assets of the institution". FIRREA clarifies that the FDIC Corporate "[w]ith respect to any asset acquired or liability assumed ... shall have all of the rights, powers, privileges, and authorities of the Corporation as

---

2. This Court later dismissed the Trustee's derivative claims. *Brandt v. Bassett,* Case No. 93–1829

(Order August 31, 1994).

receiver under sections 1821 and 1825(b) of this title." 12 U.S.C. § 1823(d)(3)(A).

The Trustee relies on *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), for the proposition that as the sole shareholder of the Bank, it should not be denied access to information regarding the activities of the corporation on the basis of the corporation is privilege. In *Garner*, the Court held that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103–04. The Trustee claims that it is a beneficiary of the FDIC's receivership, and that it is therefore entitled to demonstrate good cause as to why the privilege should not be asserted against him in this action.

The FDIC argues that *Garner* does not apply in this case because *Garner* was decided in the context of a dispute between a viable corporation and some of its shareholders. Moreover, *Garner* is premised upon the fact that the duty of corporate management runs ultimately and only to the shareholders; however, in this case, as a receiver of a failed bank, the FDIC's statutory obligations safeguard many other interests. Furthermore, the Fifth Circuit discussed its decision in *Garner*, explaining that the reasoning in Garner was based on "the nature of the corporation. Management operates a corporation for the shareholders. There is a 'mutuality of interest' between shareholders and management." *Koenig v. Int'l Systems and Controls Corp.*, 693 F.2d 1235, 1239 (5th Cir. 1982). The FDIC argues that the nature of the FDIC in its receivership capacity is not analogous to the nature of the corporation in *Garner*, and that consequently, the attorney-client privilege is unavailable to the Trustee. This Court agrees. Additionally, the Fifth Circuit noted that "Garner's rationale indicates that it was not intended to apply to work product." *Id.* at 1239. Once there is

sufficient anticipation of litigation to trigger the work product immunity, the mutuality of interests between the shareholder and management, which may exist for the attorney-client privilege, is destroyed. *Id.* See also *Cox v. Administrator United States Steel and Carnegie*, 17 F.3d 1386, 1422–23 (11th Cir.1994) (acknowledging *Koenig* and recognizing that the *Garner* doctrine does not extend to work product, which enjoys a "nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances").[3] Therefore, this Court finds that the Trustee cannot assert a joint privilege with the FDIC with respect to the post-closing documents.

### 3. Ethical Obligations

"[A] court has 'inherent authority to control and preserve the integrity of its Judicial proceedings.'" *Smith*, 838 F.Supp. at 1578 (quoting *In re Shell Oil Refinery*, 143 F.R.D. 105, 109 (E.D.La.1992)). "Deeply rooted in the common law tradition is the power of any court to 'manage its affairs which necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.'" *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir.1993) (quoting *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir.1985)). "A court may appropriately sanction a party or attorney who 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Id.* at 1545–46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978)). Having been admitted *pro hac vice*, and as a guest of this Court, attorney Bainton must also conduct himself in a manner consistent with the rules of ethics to which all attorneys practicing before this Court must comply. However, throughout these proceedings, Mr. Bainton has failed to adhere to his obligations as an officer of this Court.

While Mr. Bainton's claim of entitlement to the post-closing documents may have had merit, he chose to circumvent the court's

---

**3.** Even if the *Garner* doctrine applies, the Trustee has not demonstrated good cause as to why the

privilege should not be asserted against him.

process when he copied the documents. It should have been blatantly obvious to Mr. Bainton that he had accidentally come into possession of privileged materials. Mr. Bainton admits that the documents were conspicuously labeled as confidential and privileged, however, he argues that the FDIC would have put that label on a roll of toilet paper, and he decided to copy them anyway. This type of conduct is unacceptable. Mr. Bainton admits that he was skeptical about whether the FDIC was actually giving him access to the documents in Atlanta. He knew or should have known that the FDIC would not voluntarily turn over the very documents they were attempting to keep away from him in the turnover preceeding, which was pending at that time. Mr. Bainton was in Atlanta for the sole purpose of imaging pre-closing documents which had already been tagged for copying in Orlando. When he noticed the boxes of post-closing documents, and was skeptical as to whether he was being permitted to copy them, he had an obligation to notify the FDIC attorney and follow her instructions.

Even after Mr. Bainton realized that FDIC did not want him to have those documents and demanded their return, he refused to return them. Even if in Atlanta, he thought he was being given access to the documents, he had an ethical duty to return them once the FDIC requested their return, and he had a further duty not to use them until the Court determined his entitlement to them. There was no reason for Mr. Bainton to use these documents, even as sealed exhibits, to prove that he was entitled to them. The contents of the documents are not related to whether he shares a privilege with the FDIC or to whether the FDIC waived that privilege.

Plaintiff argues that because he claimed that the documents should have been produced pursuant to a joint privilege, his conduct in reviewing and copying the materials cannot be considered in any respect improper. This Court disagrees. Plaintiff should have waited for the Court to determine the validity of his claim of joint privilege before copying all of the documents at issue and using some as exhibits in Court documents.

It appears that Mr. Bainton cannot obey even a simple and direct order from this Court regarding the use of these documents. On April 5, 1996, this Court ordered that pending the Court's determination of the FDIC's Motion for Return of Documents, Plaintiff, his employees and counsel could not

utilize, directly or indirectly, any of the Post–Closing Privileged Documents or the information contained therein for any purpose whatsoever until further order of this Court. Such documents or the information contained therein shall not be made available, directly or indirectly, to any third parties including, but not limited to the media. Any such violation of this provision shall result in the imposition of sanctions.

(DE 51 at 2). On May 2, 1996, various statements made by Plaintiff and Plaintiff's counsel appeared in the *Miami Daily Business Review* where both Plaintiff and Mr. Bainton were quoted as saying "I'd love to show the smoking gun"; "Suppressing the FDIC documents would be like suppressing the gun in a murder investigation"; "Brandt feels like Daniel Ellsberg must have felt when he got his hands on the Pentagon papers"; and "I don't know what I'll do if the judge orders me to return them." By making these statements, Mr. Bainton and the Trustee demonstrated disregard for this Court's Order. They have prejudiced the Defendants in the media and in this court by their conduct.

This Court has the power to protect the integrity of its judicial proceedings and must do so in order to ensure a fair administration of justice. Therefore, the misconduct demonstrated by the Trustee and Mr. Bainton throughout these proceedings cannot be tolerated and should be sanctioned. This Court finds that the post-closing documents should be immediately returned to the FDIC, a protective order be entered prohibiting the Trustee from using any of the Post–Closing documents or the information contained therein for any purpose whatsoever, and that this Court rescind Mr. Bainton's *pro hac vice* status in this Court.

This Court is by no way the first Court to sanction Mr. Bainton's behavior. In 1989, the Second Circuit found that "Attorney

Bainton has demonstrated a blatant disregard of the rules and regulations which permit the judicial machinery to function smoothly. An obligation is imposed on this Court to exercise its disciplinary powers to deter such happenings in the future." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1128 (2d Cir.1989) (citations omitted). The Court stated that "[b]ecause Mr. Bainton is not a novice in the legal field, we assume that he is familiar with the standards and rules under which lawyers practice their profession. This being so, his frequent disregard of those rules and standards cannot be condoned." *Id.* at 1127.

Therefore, upon due consideration, it is hereby ORDERED that

1. Defendant's Motion is GRANTED. Plaintiff shall identify all post-closing documents in his possession and return the same and all copies to the FDIC.

2. A protective order shall be in place as to the post–closing documents and Plaintiff is prohibited from using any of the post-closing documents or the information contained therein, directly, or indirectly, for any purpose whatsoever.

3. Mr. Bainton's *pro hac vice* status in this Court is hereby rescinded.

4. Defendant's request for attorney's fees and costs incurred in connection with this motion is GRANTED and Defendant shall submit a bill of costs so that this Court may determine the amount.