Monica MADANES, Plaintiff,

v.

Pablo MADANES; Miguel Madanes; Leiser Madanes; Richard Ortoli; Rubin & Bailin; Rubin, Kalnick, Bailin, Ortoli, Abady & Fry, P.C.; Baltimore Ltd.; Swansea Holding, Inc.; Transmarketing and Product Research Co. Panama; Procida, Ltd., a/k/a Pegaso Ltd., and Does 1–10, Defendants.

Pablo Madanes; Miguel Madanes; Leiser Madanes; Richard Ortoli; Rubin & Bailin; Rubin, Kalnick, Bailin, Ortoli, Abady & Fry, P.C., Third–Party Plaintiffs,

v.

Jorge Miguel Pomiro, Third–Party Defendant.

No. 96 Civ. 6398(LBS) (JCF).

United States District Court, S.D. New York.

April 6, 1999.

280

William E. Zuckerman, Morrison & Foester LLP, New York City, for plaintiff.

Michael D. Schissel, Arnold & Porter, Robert D. Piliero, Piliero & Goldstein, Susan J. Kohlmann, Winthrop, Stimson, Putnam & Roberts, New York City, for defendants.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

This is an action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, by Monica Madanes against her brothers, Pablo Madanes, Miguel Madanes, and Leiser Madanes (the "Madanes Brothers"), as well as against various entities allegedly controlled or utilized by them. Ms. Madanes charges that her brothers deprived her of her share of the family's assets through a pattern of mail and wire fraud and money laundering. Monica Madanes and her brothers are all citizens of Argentina.

The plaintiff now moves pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure for an order compelling the defendants to produce certain documents and answer certain interrogatories. Specifically, Ms. Madanes seeks three categories of information from her brothers. She first argues that they have improperly withheld documents on the basis of the privilege against

self-incrimination under the Argentine Constitution. Second, the plaintiff asserts that her brothers have wrongfully withheld information, including "personal" bank account records, in the mistaken belief that such information is not relevant to this litigation. Third, she contends that her brothers have failed to produce certain bank records that they previously conceded were relevant. Next, the plaintiff seeks information from defendant Transmarketing and Product Research Co. Panama ("Transmarketing") concerning a bank account that was purportedly used by the Madanes Brothers to control and conceal family assets. Finally, Ms. Madanes has demanded information from defendant Procida Ltd. a/k/a Pegaso Ltd. ("Procida"), an entity that was allegedly established by Pablo Madanes to control funds, including family assets.

The defendants oppose the plaintiff's motion, and the Madanes Brothers have cross-moved for a protective order recognizing their right against self-incrimination under Argentine law and restricting the disclosure of certain discovery materials in order to minimize the possibility that they would prosecuted criminally in Argentina. Independent of the self-incrimination issue, the Madanes Brothers argue that the plaintiff's motion to compel should be denied because her remaining document requests seek irrelevant or duplicative information, while the outstanding interrogatories do not comply with the local civil rules of this Court. The defendants also argue that the plaintiff's motion is premature to the extent that it seeks information about bank accounts that the Madanes Brothers themselves are unfamiliar with and are currently investigating.

Transmarketing opposes the plaintiff's motion on the ground that it is simply a stakeholder. It contends that if it were to disclose the requested account information prior to a ruling by this Court, it would render moot any self-incrimination privilege that the Madanes Brothers could assert with respect to that data.

Finally, Procida argues that it has disclosed information sufficient to demonstrate that it was not the repository for any assets to which Monica Madanes has a claim, and it therefore resists further discovery on grounds of relevance. In addition, Procida and the Madanes Brothers seek the return of Procida-related documents received by Monica Madanes from Jorge Pomiro, a former attorney for Pablo Madanes. The defendants contend that Mr. Pomiro breached his ethical duties by disclosing his attorney files, including privileged information, to Monica Madanes.[1]

Additional background information will be provided below as it relates to each legal issue.

*Discussion*

### A.  *Self–Incrimination*

The Madanes Brothers contend that the disclosure of certain banking records sought by the plaintiff would subject them to a risk of criminal prosecution in Argentina. The defendants recognize that *United States v. Balsys*, 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998), forecloses any such claim based on the United States Constitution, since in that case the Supreme Court held that the threat of prosecution by a foreign government is beyond the scope of the Self–Incrimination Clause of the Fifth Amendment. *Id.* at ——, 118 S.Ct. at 2222–23. Instead, the Madanes Brothers assert their claim of privilege based on the Argentine Constitution. They do not seek to withhold the purportedly incriminating information altogether, but rather request that the existing confidentiality order in this case be modified to place stringent limitations on the use and dissemination of the documents.

The plaintiff opposes the defendants' reliance on the privilege on a number of grounds. First, she contends that the Argentine privilege against self-incrimination does not apply in civil proceedings such as this. Further, Ms. Madanes argues that even if the privilege is generally applicable in

---

1.  The parties filed their briefs on these motions under seal in light of the possibility that they include allusions to confidential information. This Memorandum and Order contains no such information, and the fact that a party raises a self-incrimination claim is not itself privileged. Therefore, this opinion is not sealed.

civil actions, principles of comity do not militate in favor of recognizing it in this case. Finally, the plaintiff maintains that the modifications to the confidentiality order sought by the defendants are unworkable and unnecessary.

■ Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, a "court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." In this case, the parties have submitted the text of the relevant provision of the Argentine Constitution, the opinions of experts on Argentine law, excerpts from learned treatises, and published opinions from Argentine courts. Since foreign law is an issue of law rather than of fact, it is not the credibility of the experts that is at stake, but rather the persuasiveness of their opinions. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir.1998).

In theory, there are several possible models for the application of the privilege against self-incrimination to civil litigation. At one extreme, the privilege may not apply at all to non-criminal proceedings. According to some sources, that is the case with respect to Article 18 of the Argentine Constitution. For example, German Bidart Campos, while advocating a wider application of the privilege against self-incrimination, nevertheless states that "[t]his privilege has generally been understood to be limited to criminal proceedings." 2 German J. Bidart Campos, *Derecho Constitucional* ["Constitutional Law"] 487–88 (1966). Similarly, the plaintiff's expert, Dr. Marcelo Gebhardt, argues that "[b]ecause Article 18's protection against self-incrimination acts as a limitation on the government's coercive power, it is only intended to have strict application in criminal prosecutions." (Declaration of Marcelo Gebhardt dated Oct. 16, 1998 ¶ 7. Dr. Gebhardt relies on language in "Goyena," 312 Fallos 2438 (1989)),[2] a decision by the Supreme Court of Argentina. There, the court stated

that "the guarantee under which no person can be compelled to testify against himself, as set forth in Article 18 of the Constitution of Argentina, only covers individuals prosecuted in criminal cases." *Id.* at 2440.

The breadth of this statement, however, is misleading. In his concurring opinion in "Goyena," Attorney General Carlos S. Fayt implies that the applicability of the privilege turns not on whether the proceeding is civil or criminal but rather on the nature of the sanction that the declarant faces: the privilege is triggered if the declarant is exposed to criminal penalties but not if he merely faces civil sanctions. 312 Fallos at 2443. Moreover, Jorge A. Bacque, one of the two justices who joined in the majority opinion in "Goyena," has submitted an affidavit in this case agreeing with Dr. Fayt's interpretation of Article 18. According to former Justice Bacque, "Argentina's guarantee against self-incrimination protects a party in a civil lawsuit from being compelled to testify or produce documents that may criminally incriminate him/her." (Reply Declaration of Jorge A. Bacque dated Dec. 21, 1998 ("Bacque Reply Decl.") ¶ 6).

This view is supported by the decision of the Argentine Supreme Court in "Migliore," 238 Fallos 416 (1957). There, the court held that

> the constitutional guarantee that no person can be compelled to testify against himself does not bar requiring, in civil matters, declarations that are relevant to the circumstances of the trial. And the fact that this requirement was ordered under caution does not allow us to conclude that such order was penal in nature for purposes of fitting the case to the provisions of Article 18 of the Argentine Constitution.

As former Justice Bacque points out, the discussion of whether issuing the order "under caution" rendered it penal would be entirely unnecessary if the privilege were simply inapplicable in any civil proceeding. (Bacque Reply Decl. ¶ 5). The position that Article 18 provides no protection in civil litigation is therefore untenable.

---

**2.** By convention, Argentine cases are cited only by the name of the petitioner and are placed in quotation marks rather than underlined.

At the other end of the spectrum, some commentators argue that the privilege against self-incrimination should preclude any sanction against a civil litigant who declines to disclose evidence because of the fear of criminal prosecution. Thus, although he recognizes that his view is not widely accepted, Dr. Bidart Campos contends that because the text of Article 18 does not distinguish between civil and criminal proceedings, a civil litigant should not be coerced to testify by any means, including the threat that an adverse inference will be drawn from his silence. Bidart Campos, *supra*, at 488. Miguel Angel Ekmekdjian takes a similar position. While noting that Argentine rules of civil procedure require the disclosure of evidence, he argues that this violates the litigant's rights under Article 18 where the information to be disclosed is incriminating. 2 Miguel Angel Ekmekdjian, *Tratado de Derecho Constitucional* ["Constitutional Law Treatise"] 323 (1994).

But this viewpoint has no basis in Argentine caselaw. As noted above, the Supreme Court stated in "Migliore" that Article 18 does not bar a civil litigant from being required to testify. 238 Fallos at 416. Similarly, in "Grillo," 253 Fallos 493 (1962), the court held that the right against self-incrimination did not prevent a party in a civil lawsuit from being deemed to have made an admission when he refused to answer interrogatories because of the fear that he would be prosecuted.

The decisions of the Argentine Supreme Court, then, do not support either extreme interpretation of Article 18. Rather, as the cases described demonstrate, the right against self-incrimination can be raised in civil as well as criminal proceedings, but it will not shield the litigant from the civil consequences of the failure to testify, such as the imposition of an adverse inference with respect to issues on which he stands mute.

To this extent, Argentine law is parallel to the United States Supreme Court's interpretation of the Self–Incrimination Clause of the Fifth Amendment. That provision

> not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

*Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (citation omitted); *see also Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Andover Data Services, a Division of Players Computer, Inc. v. Statistical Tabulating Corp.*, 876 F.2d 1080, 1082 (2d Cir. 1989). Nevertheless, the Fifth Amendment does not preclude a court from drawing an adverse inference against a civil litigant who asserts the privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 316–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

However, in one important respect, the Argentine and American privileges against self-incrimination diverge. In the United States, even if documents contain incriminating information, requiring a person to produce them does not implicate the Fifth Amendment unless the act of production is itself testimonial in nature and incriminating to the person making the disclosure. *See United States v. Doe*, 465 U.S. 605, 609–10, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Fisher v. United States*, 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Thus, where the producing party's implicit admission that a document exists or is within his control constitutes an incriminating statement, he may assert the Fifth Amendment privilege, *id.* at 410–11, 96 S.Ct. 1569, but absent such circumstances, the privilege has no application to the production of documents.

By contrast, Article 18 of the Argentine Constitution makes no distinction between compelled testimony and the compelled production of documents: if the evidence disclosed would be incriminating, the privilege may be asserted. (Affidavit of Hector A. Mairal dated Nov. 9, 1998 ¶ 5; Ekmekdjian, *supra*, at 323; Statement of Jorge A. Bacque dated Nov. 5, 1998 ¶ 6; Statement of Roberto Durrieu dated Nov. 5, 1998 ¶ 7; Undated Declaration of Lino Enrique Palacio ¶ 2; Bacque Reply Decl. ¶ 6). Consequently, to the extent that the records sought by the

plaintiff in this case would tend to expose the Madanes Brothers to criminal liability, the privilege against self-incrimination established by Article 18 would apply.

### 1. *Likelihood of Prosecution*

In order to assert the privilege against self-incrimination under the Fifth Amendment to the United States Constitution, a witness must demonstrate that he is "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *see also United States v. DeSalvo,* 26 F.3d 1216, 1221 (2d Cir.1994); *G.D. Searle & Co. v. Interstate Drug Exchange, Inc.,* 117 F.R.D. 495, 500 (E.D.N.Y.1987). The same principle applies to assertion of the privilege as established by Article 18 of the Argentine Constitution. Thus, "a witness's entitlement to refuse to answer questions implying the acknowledgment of a criminal offense ... cannot be valid if the danger is imaginary or insubstantial...." Norberto E. Spolansky, "Nadie Esta Obligado a Declarar Contra Si Mismo, Falso Testimonio y Culpabilidad" ["No Person Can Be Compelled to Testify Against Himself, Perjury and Culpability"], 140 *La Ley* 701, 702–03 (1970).

In determining whether the purported fear of prosecution is well-founded, it is often necessary to conduct a proceeding *in camera;* otherwise, disclosure of incriminating material in the course of litigating this issue would itself breach the privilege. *See Estate of Fisher v. Commissioner of Internal Revenue,* 905 F.2d 645, 650 (2d Cir.1990); *United States v. Freidus,* 135 F.R.D. 52, 60 (S.D.N.Y.1991). Accordingly, I conducted an *ex parte* hearing in which the defendants proffered their evidence that the records at issue here are reasonably likely to subject the Madanes Brothers to criminal liability in Argentina.

The defendants identified several Argentine penal laws that the Madanes Brothers may have violated. (Sworn Statement of Roberto Durrieu dated Nov. 23, 1998 ("Durrieu Sealed Stat.") ¶¶ 2–6 & Exh. B, C, D, E, F,; Sworn Statement of Aurelio Cid dated Nov. 23, 1998 ("Cid Sealed Stat."). ¶¶ 3–8 & Exh. F, H, I). Further, they provided convincing evidence that the records requested by plaintiff, if obtained by Argentine authorities, could lead to prosecution of the Madanes Brothers under those laws. (Transcript of *In Camera* Proceedings Jan. 21, 1999 ("Tr.") at 3–25). Finally, although some of the potentially criminal acts at issue were completed some time ago, others would be considered ongoing acts, and criminal prosecution would therefore not be barred by the statute of limitations. (Tr. at 16–17).

### 2. *Recognition of the Privilege*

■■■ The Argentine privilege against self-incrimination, then, may be asserted in civil proceedings where, as here, the litigant has a well-founded fear of criminal prosecution. However, because it is a privilege arising under foreign law, it does not apply in this forum of its own force. Rather, United States courts will recognize a foreign privilege to the extent consistent with principles of comity.

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

■■ "[T]he concept of international comity requires ... [a] particularized analysis of the respective interests of the foreign nation and the requesting nation ...." *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 543–44, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). In *Aerospatiale,* the Supreme Court identified five factors relevant to this analysis:

> "(1) the importance to the litigation ... of the documents or other information requested;
>
> (2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."

*Id.* at 544 n. 28, 107 S.Ct. 2542 (quoting *Restatement of Foreign Relations Law of the United States (Revised)* § 437(1)(c) (tent. Draft No. 7, 1986), subsequently adopted as *Restatement (Third) of Foreign Relations Law of the United States,* § 442(1)(c)).

■ The fifth factor—the balancing of national interests—is the most important, as it directly addresses the relations between sovereign nations. While the formulation in *Aerospatiale* compares the interests of the United States with the interests of the country "where the information is located," that language was crafted in the context of a conflict between American discovery procedures and a French "blocking statute" that forbade the disclosure of evidence in proceedings outside France. The same type of balancing necessarily applies in connection with the self-incrimination privilege as well, where the foreign interest is not that of the nation "where the information is located," but rather of the country whose privilege is being invoked and where any potential criminal prosecution would take place.

Here, the predominate interest is that of the Republic of Argentina in recognition of a right established by its Constitution. Of course, Argentina has an interest in enforcement of its criminal laws. Nevertheless, its sovereign interest encompasses not only the powers of government but also the limitations imposed by the Constitution on the exercise of these powers. Thus, it is contrary to Argentina's national interest if its citizens' rights are circumvented when they are sued in forums where those rights are not recognized. As the Supreme Court said in *Aerospatiale:*

American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.

482 U.S. at 546, 107 S.Ct. 2542. Although the interest of a foreign national is not always coextensive with that of his country of citizenship, it is closely related when his constitutional rights are at stake.

By contrast, the interests of the United States are attenuated in this case. It is true that "[t]he United States certainly has a strong national interest in fully and fairly adjudicating matters before its courts." *First American Corp. v. Price Waterhouse LLP,* 988 F.Supp. 353, 364 (S.D.N.Y.1997), *aff'd,* 154 F.3d 16 (2d Cir.1998). And private enforcement of RICO claims, such as those asserted here, is "infused with the public interest." *Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. 517, 523–24 (S.D.N.Y.1987); *see also First American Corp.,* 988 F.Supp. at 364. But these interests diminish the less closely a case is related to the United States. Here, the controversy concerns a dispute among Argentine nationals over their family's assets. Though some assets are present in the United States, thus providing a nexus for jurisdictional purposes, the bulk of them are abroad.

Furthermore, this country has little stake in overriding a foreign law privilege that closely parallels a right under the United States Constitution. In this respect, the instant action is distinct from those cases in which courts order discovery of foreign persons in the face of blocking statutes that purport to prevent disclosure of information which would be discoverable if sought in this country. The balancing of sovereign interests, then, tips decidedly in favor of recognizing the Argentine privilege against self-incrimination.

The remaining factors in the *Aerospatiale* analysis—the importance of the information

requested, the specificity of the request, where the information originated, and the availability of other options for obtaining the information—can be dealt with quickly. The bank records at issue are clearly important to this case, since they are necessary in order to trace the ownership and control of the Madanes Family assets. This factor therefore favors disclosure. However, as will be discussed below, the necessary discovery can be conducted without abrogating the Madanes Brothers' right against self-incrimination.

The general nature of the plaintiff's discovery requests cuts against overriding a claim of privilege based on foreign law. *See Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1475 (9th Cir.1992) (generalized searches for information where disclosure is forbidden by foreign law are prohibited). Rather than attempt to trace assets transaction by transaction, the plaintiff has chosen to demand production of all records of numerous accounts held or controlled by her brothers in the expectation of being able to identify assets that were allegedly diverted from her. While this approach may be necessary in light of the complexity of the family's financial dealings, it deprives the Court of the ability to identify when specific discovery requests would create the risk of criminal prosecution and when they would not.

The location of the information and parties does not favor either side. This factor is relevant when the issue is whether the persons responsible for disclosure are subject to the terms of a blocking statute. *See id.* (fact that documents and custodians are in China and subject to its blocking statutes militates against disclosure).

The final factor is whether there are alternate means of obtaining the information. "If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law." *Id.* On one hand, the bank records at issue here cannot simply be subpoenaed: pursuant to bank secrecy laws, the custodians would resist disclosure unless they received authorization from the owners of the accounts. On the other hand, conditions can be set on disclosure that will provide the plaintiff with

access to the necessary information without unduly exposing the defendants to the risk of criminal prosecution. In this sense, there is an alternative to overriding the privilege.

In sum, the major consideration—a balancing of the competing national interests—strongly favors recognizing the Argentine privilege. To the extent that any of the remaining factors is to the contrary, these interests can be satisfied by carefully structuring disclosure rather than by abrogating the privilege altogether. Accordingly, the privilege against self-incrimination as established by Article 18 of the Argentine Constitution shall be recognized in this litigation.

### 3. *Contours of a Protective Order*

It is appropriate for courts to fashion protective orders in order to accommodate the conflicting needs of the party seeking discovery and the party asserting the privilege against self-incrimination.

> [B]ecause *all* parties—those who invoke the Fifth Amendment and those who oppose them—should be afforded every reasonable opportunity to litigate a civil case fully and because exercise of Fifth Amendment rights should not be made unnecessarily costly, courts, upon an appropriate motion, should seek out those ways that further the goal of permitting as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege. Thus, if there is a timely request made to the court, the court should explore all possible measures in order to select that means which strikes a fair balance and accommodates both parties. In doing this, it should give due consideration to the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties.

*United States v. Certain Real Property and Premises Known As: 4003–4005 5th Avenue, Brooklyn, NY,* 55 F.3d 78, 83–84 (2d Cir. 1995) (internal quotations, citations, and footnotes omitted). One means of accommodation is an order shielding discovery from disclosure to third parties. *See Martindell v. International Telephone & Telegraph Corp.,* 594 F.2d 291, 295–96 (2d Cir.1979); *United*

*States v. Talco Contractors, Inc.,* 153 F.R.D. 501, 509 (W.D.N.Y.1994). The issue in this case is whether the protective order currently in place needs to be modified to strike the proper balance.

Pursuant to the Protective Order dated May 21, 1998, ("Protective Order"), any party may deem discovery materials to be "Confidential Information." (Protective Order ¶ 4). Such information may be disclosed only to qualified persons, who include the parties, counsel of record, independent accounting and financial experts, and potential witnesses. (Protective Order ¶ 4(c)). In addition, all adverse parties are denied access to litigation material that may be potentially incriminating, and material which is designated "Highly Confidential" may not be disclosed to other parties. (Protective Order ¶ 5).

The defendants propose five specific modifications to these provisions. First, they argue that the unredacted set of bank statements should be maintained exclusively by the Court, with access limited to the plaintiff, the Madanes Brothers, and their respective attorneys. Next, the defendants suggest that redacted copies of the bank statements, with all identifying information including bank names and account numbers removed, be provided to plaintiff's counsel to be maintained in a secure location in New York. Third, redacted copies of the documents could be shown to accounting experts at the offices of plaintiff's counsel in New York, provided that the identities of the experts are revealed in advance to the Madanes Brothers. Fourth, redacted copies could be shown to potential witnesses, provided that the witness are identified in advance. Finally, the bank statements could be used in depositions, provided that portions of the deposition transcripts as well as any exhibits referring to the bank statements would be maintained with the Court.

█ In order to determine whether to issue or modify a protective order under Rule 26(c) of the Federal Rules of Civil Procedure, it is necessary to conduct a three-step analysis. First, the party resisting discovery has the burden of showing that the information requested is confidential and its disclosure would be harmful. Then the burden shifts to the party seeking discovery to demonstrate that the information sought is relevant and necessary. Finally, the court must weigh the need for the information against the harm that would result from disclosure. *See In re Remington Arms Co.,* 952 F.2d 1029, 1032 (8th Cir.1991); *Rywkin v. New York Blood Center,* No. 95 Civ. 10008, 1998 WL 556158 at *3 (S.D.N.Y. Aug. 31, 1998).

In this case, the parties easily meet their respective burdens on the first two prongs. The potentially incriminating information is confidential, and its disclosure could cause significant harm to the Madanes Brothers. At the same time, the bank statements are critical to fair litigation of the plaintiff's claims. These interests must therefore be weighed in determining whether the requested modifications to the Protective Order are warranted.

█ Because of the harsh consequences of disclosure of incriminating information, it is appropriate to place strict limitations on the disclosure of the unredacted bank statements. The restrictions proposed by the Madanes Brothers, however, are unworkable. Maintaining the only unredacted copy at the court would hamper the ability to plaintiff's counsel to prepare for trial, and denying access to plaintiff's financial experts would make it virtually impossible for them to analyze the transactions. Likewise, potential witnesses could hardly provide insight into financial records from which all identifying information had been redacted. Accordingly, unredacted copies of the bank statements shall be maintained in a secure location at the offices of plaintiff's counsel in New York, where the parties, their attorneys, any independent financial expert, and any witness may review them.

█ The defendants' request that experts and witnesses be identified in advance before being given access to the bank statements is not justified. Such advance notice is warranted where there is reason to believe that the potential witnesses may have a vested interest in appropriating or misusing the information. *See Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D.

135, 144–45 (S.D.N.Y.1997) (where experts may have relation to producing party's competitors, experts' identity must be disclosed before trade secrets are revealed to them). That is not the case here. There is no suggestion that either potential witnesses or the plaintiff's experts are allied with the Argentine authorities that would prosecute any perceived criminal activities. If the identity of these persons were to be revealed in advance, the one party could gain an unfair tactical advantage in litigation. Of course, under the Protective Order the parties would continue to require persons having access to the bank statements to agree in writing to maintain their secrecy, and the list of persons who had access to confidential information would be exchanged at the conclusion of the case. (Protective Order ¶ 9).

■ In order to maintain the security of the bank statements, no copies, either redacted or unredacted, shall be removed from the offices of plaintiff's counsel by any witness or expert. This will create some hardship, but the burden can be alleviated by requiring the Madanes Brothers to pay the costs of transportation and accommodation for any witness or expert to come to New York to review the documents. This is a fair result, since these costs are generated by the defendants' desire to maintain confidentiality. In order to prevent the reimbursement process from requiring disclosure of the identity of witnesses and experts, the plaintiff shall bear the expense in the first instance but shall be entitled to recover those costs at the conclusion of the litigation.

Finally, two complete sets of bank statements, one redacted and the other unredacted, shall be available for use at each deposition. Any portion of a deposition or exhibit referring to a bank statement shall be kept secure in the same manner as the bank statements themselves.

These modifications are not foolproof. "A Rule 26(c) protective order, no matter how broad its reach, provides no guarantee that compelled testimony will not somehow find its way into the government's hands for use in a subsequent criminal prosecution." *Andover Data Services*, 876 F.2d at 1083. Nevertheless, it provides the Madanes Brothers

with the maximum degree of protection consistent with the plaintiff's entitlement to fair and efficient litigation of her claims.

### B. *Interrogatories and Document Requests*

The plaintiff contends that the Madanes Brothers have wrongfully failed to answer interrogatories and produce information in response to document requests. The first group of discovery demands in dispute consists of Interrogatories No. 20, 21 and 22 of Plaintiff's First Set of Interrogatories to Pablo Madanes, and the corresponding interrogatories propounded to Miguel Madanes and Leiser Madanes. In substance, these interrogatories ask for the identification of bank accounts, brokerage accounts, and the like, maintained, used, or owned by the Madanes Brothers, Monica Madanes, or their parents. The defendants object to these interrogatories on the grounds that they seek irrelevant information, violate Rule 33.3(a) of the Civil Rules of the United States District Court for the Southern District of New York (the "local civil rules"), and would violate the Madanes Brothers' rights against self-incrimination.

■ Relevance is an elastic concept, and it is reasonable to construe relevance more generally in requiring responses to interrogatories than in mandating the potentially more onerous production of documents. Here, for example, identifying the universe of accounts utilized by the Madanes Family will surely facilitate focusing upon those accounts that may have been used in suspect transactions. Thus, the identities of the accounts are relevant, though the relevance of all account documents may not yet have been demonstrated. The defendants' relevance objection is therefore rejected.

The defendants' reliance on local civil rule 33.3 is also misplaced. That rule provides in pertinent part:

(a) Unless otherwise ordered by the court, at the commencement of discovery, interrogatories will be restricted to those seeking names of witnesses with knowledge of information relevant to the subject matter of the action .... and the existence, custo-

dian, location and general description of relevant documents. . . .

(b) During discovery, interrogatories other than those seeking information described in paragraph (a) above may only be served (1) if they are a more practical method of obtaining the information sought than a request for production or a deposition, or (2) if ordered by the court.

Local Civil Rule 33.3. Even if the interrogatories were originally served at the outset of the case, discovery has progressed well beyond the initial stages, and the provisions of local civil rule 33.3(b) would therefore apply. In this case, interrogatories are a more efficient means of identifying accounts than either demands for account documents or depositions of witnesses who could hardly be expected to have comprehensive memories of their financial affairs.

Finally, in light of the modifications made to the Protective Order, the Madanes Brothers can no longer resist discovery on the basis of the Argentine privilege against self-incrimination. Therefore, Pablo Madanes, Miguel Madanes, and Leiser Madanes shall each answer Interrogatories No. 20, 21, and 22 of the Plaintiff's First Set of Interrogatories.

■ The defendants' objections to Interrogatory No. 34 addressed to Pablo Madanes and the corresponding Interrogatory No. 33 to Miguel and Leiser Madanes have more merit. These questions seek a listing of all payments made to the Madanes Brothers or to someone on their behalf by any of a series of thirty entities. A document request is a far more practical means of obtaining such information than is an interrogatory. Therefore, these interrogatories violate local rule 33.3 and need not be answered.

The plaintiff also seeks to compel responses to Requests No. 8, 9, 10, 11, 36, 37, 38, 39, and 41 in Plaintiff's First Request for Production of Documents to Pablo Madanes, as well as to the analogous requests made to Miguel and Leiser Madanes. The Madanes Brothers agreed to produce all documents demanded in Requests No. 10, 11, and 41, except for those as to which they claimed the privilege against self-incrimination. Now that the privilege issue has been resolved,

they shall produce all documents responsive to these requests, subject to the terms of the modified Protective Order.

The remaining document requests in essence seek all documents relating to any assets in which any of the Madanes siblings or their parents had an interest. Even given the wide sweep of the complaint, these requests are overbroad. Perhaps recognizing this, the plaintiff agreed to limit her requests to any asset in which two or more members of the Madanes Family had an interest. But there is little logic in this proposal since, for example, two of the Madanes Brothers may have purchased an asset with funds to which Monica Madanes has no claim; documents concerning that asset would be wholly irrelevant.

The defendants shall, however, produce the requested documents with respect to any asset in which the plaintiff or her parents had a direct or indirect interest, including assets that derive from other assets that fall within this definition. For example, if Monica Madanes owned a brokerage account jointly with her brothers, and the brothers liquidated the account and used the proceeds to buy real property, documents relating to both the account and the property would be discoverable. Moreover, the disclosure applies to assets belonging to her parents as well as to the plaintiff because this litigation involves in part her claim that her brothers diverted family assets from her to themselves at the time of the parents' deaths. With these modifications, the Madanes Brothers shall produce documents responsive to Requests No. 8, 9, 36, 37, 38, and 39 of Plaintiff's First Request for Production of Documents to Pablo Madanes, Requests No. 8, 9, 33, 34, 35, and 36 of Plaintiff's First Request for Production of Documents to Miguel Madanes, and Requests No. 8, 9, 33, 34, 35, and 36 of Plaintiff's First Request for Production of Documents to Leiser Madanes.

Finally, the plaintiff seeks to compel production of information about specified accounts that the Madanes Brothers have declined to produce until they can ascertain the nature of the accounts. At a pretrial conference in September 1998, I suggested that the

defendants obtain the account information themselves, review it, and determine whether to raise any objections to production. Notwithstanding the time that has elapsed, the Madanes Brothers acknowledge that they have not reviewed any of the documents. They shall do so promptly and shall either produce the documents or raise specific objections within thirty days, failing which all objections shall be deemed waived.

### C. *Transmarketing Documents*

As noted above, Transmarketing declined to produce documents solely in order not to undercut any objections raised by the Madanes Brothers, including their assertion of the privilege against self-incrimination. Now that those objections have been resolved, Transmarketing shall produce the requested documents to the extent consistent with this decision.

### D. *Procida Documents*

Procida has moved for summary judgment on the ground that it has produced information sufficient to demonstrate that it was never the conduit for any of the funds in dispute. In addition, together with the Madanes Brothers, Procida seeks the return of documents that it contends were wrongfully disclosed to Monica Madanes by Jorge Pomiro, who was previously an attorney for Pablo Madanes. The plaintiff argues that the summary judgment motion is premature in that she has not yet had a full opportunity for discovery of Procida. She further contends that because she played no role in the revelation of the Procida documents by Dr. Pomiro, there is no basis for precluding her from utilizing them in this litigation.

#### 1. *Discovery and Summary Judgment*

The defendants have presented evidence tending to show that no funds claimed by Monica Madanes were transferred to Procida. First, in 1993, Pablo Madanes received $13.7 million as his portion of the sale of shares of the family businesses held by the Madanes Brothers. (Declaration of Pablo Madanes dated Nov. 10, 1998 ("P. Madanes Decl.") ¶¶ 5, 7 & Exh. A). He deposited these proceeds in an account owned jointly with his wife (the "Pablo Madanes Account"), which previously had no funds in it. (P. Madanes Decl. ¶ 7 & Exh. B). Approximately two weeks later, he transferred $13.689 million from that account to the account of Princehouse Enterprises Holding Limited (the "Princehouse Account"). (P. Madanes Decl. ¶ 8 & Exh. C). Of the funds in the Princehouse Account, approximately $10 million were converted into various securities. (P. Madanes Decl. ¶ 9). On December 3, 1993, the funds in the Princehouse Account, including the securities, were transferred back to the Pablo Madanes Account. (P. Madanes Decl. ¶ 11 & Exhs. B, E). In the meantime, in August 1993, Procida had been incorporated as an investment vehicle to be donated to the Cemave Trust, which was formed in December for the benefit of Pablo Madanes' daughters. (P. Madanes Decl. ¶ 12). Pablo Madanes then donated to the trustees of the Cemave Trust all of the shares of Procida, together with $10 million in cash and securities from the Pablo Madanes Account and 10,800 shares of stock in Ambiens, S.A., which had been purchased with his personal assets. (P. Madanes Decl. ¶¶ 13, 14 & Exhs. G & H). Once the assets were under the control of the trustee, they were transferred into Procida between December 10, 1993 and January 4, 1994. (Declaration of Elizabeth Ann Parkes dated Nov. 11, 1998 ¶¶ 5–6 & Exhs. B, C; Declaration of Brian Harry Carney dated Nov. 11, 1998 ("Carney Decl.") ¶¶ 4–6 & Exhs. A, B, C). Procida thus received approximately $10 million in assets (Carney Decl. ¶ 6 & Exh. C), and no additional assets were deposited into Procida after January 1994 (P. Madanes Decl. ¶ 16; Carney Decl. ¶ 7 & Exhs. D, E, F). Accordingly, the defendants argue that no further discovery concerning Procida is warranted and that Procida is entitled to summary judgment.

This evidence, however, is not conclusive for at least two reasons. First, even taken at face value, it does not establish that Procida's assets never included any disputed funds. For example, the defendants note only that Pablo Madanes' share of the proceeds from the sale of the family businesses was transferred to the Princehouse Account and that

funds from the Princehouse Account were then transferred back to the Pablo Madanes Account and ultimately into Procida. This representation does not exclude the possibility that the "untainted" funds were intermingled in the Princehouse Account, with assets to which Monica Madanes does assert a claim.

Second, the plaintiff has as yet had no opportunity to test the veracity of the information presented by the defendants. The financial records upon which the defendants rely are unaudited, unauthenticated, and, in some instances, undated. The directors of Procida and the Cemave Trust upon whose declarations the defendants rely did not hold those positions at the time of the transactions at issue. (Carney Decl. ¶ 2; Parkes Decl. ¶ 2). Indeed, the plaintiff has presented evidence that Pablo Madanes intended to capitalize Procida with funds other than those derived from the sale of the family businesses. (Affidavit of Tonia Ouellette Klausner in Support of Defendant Procida Ltd.'s Motion for Summary Judgment dated Nov. 11, 1998, Exh. A). Although Pablo Madanes contends that this proposal was never implemented (P. Madanes Decl. ¶ 17), the plaintiff is entitled to test the accuracy of that representation. Accordingly, it is premature to terminate discovery concerning Procida, and the plaintiff's motion to compel discovery of the Procida information is granted.

### 2. *Documents Improperly Obtained*

■ Jorge Pomiro acted as attorney for Pablo Madanes in connection with the formation of Procida and the donation of its shares to the Cemave Trust. Undated Declaration of Pablo Madanes ("P. Madanes Undated Decl."). He also acted as counsel at various times for the plaintiff individually, for the Madanes Family as a group, and for the family businesses. (P. Madanes Undated Decl. ¶ 25). According to the defendants, Dr. Pomiro disclosed confidential documents concerning Procida and the Cemave Trust to the plaintiff, and these documents have surfaced both in this litigation and in a related lawsuit in Switzerland. (P. Madanes Undated Decl. ¶ 27; Affidavit of Tonia Ouellette Klausner in Support of the Madanes Brothers' and Proci-

da Ltd.'s Opposition to Plaintiff's Motion to Compel and the Madanes Brothers' Cross–Motion for a Protective Order ("Klausner Protective Order Aff.") ¶ 13). The defendants contend that because Dr. Pomiro had no authority from his client to disclose these documents, the plaintiff should be ordered to return them and should be sanctioned.

■ The defendants, however, fail to draw the necessary distinction between a party that actively secures evidence that she is not entitled to and one that passively receives evidence from a questionable source. In the former situation, the court has the authority to preclude the use of the tainted material in order to deter parties from engaging in extra-legal discovery and to prevent the judicial system from being complicit in the wrongdoing. *See Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y.1997); *Perna v. Electronic Data Systems Corp.*, 916 F.Supp. 388, 396–98 (D.N.J.1995); *Smith v. Armour Pharmaceutical Co.*, 838 F.Supp. 1573, 1578 (S.D.Fla. 1993).

■ By contrast, where the party receiving the evidence was not involved in any wrongful conduct in securing it, and where the evidence itself is not privileged, there is no basis for requiring the return of the information obtained or prohibiting its use. *See Schlaifer Nance & Co. v. Estate of Warhol*, 742 F.Supp. 165, 166 (S.D.N.Y.1990). Such a sanction would have no deterrent value since the punishment would fall on the blameless party rather than on the wrongdoer who may have no interest in the litigation. Moreover, the passive recipient of non-privileged material would be deprived of information to which she would otherwise be entitled through the discovery process.

In the instant case, there is no evidence that Monica Madanes actively solicited the disclosure of confidential information from Dr. Pomiro. Furthermore, she is entitled to obtain from him through discovery any non-privileged information relevant to her claims. The fact that such information may have come into Dr. Pomiro's possession as the result of his representation of Pablo Madanes would not shield it from disclosure, since factual material obtained by an attorney, in

contrast to attorney-client communications, is not privileged. *See In re Search Warrant for Law Offices Executed on March 19, 1992,* 153 F.R.D. 55, 58 (S.D.N.Y.1994). Therefore, no general order requiring Monica Madanes to return the materials she received from Dr. Pomiro is warranted.

This leaves open the question of the status of any privileged documents. The only such documents specifically identified are letters between Pablo Madanes and his British attorneys concerning legal advice. (Klausner Protective Order Aff. ¶ 13). However, these documents were apparently publicly filed without objection in legal proceedings in Switzerland more than two years ago. (Affidavit of Charles L. Kerr dated Dec. 4, 1998 ¶ 25). By failing to take reasonable steps to maintain the confidentiality of these documents, Pablo Madanes waived any privilege. *See In re von Bulow,* 828 F.2d 94, 100–01 (2d Cir.1987); *United States v. International Brotherhood of Teamsters,* 961 F.Supp. 665, 673 (S.D.N.Y.1997). Accordingly, the defendants' application for return of the documents disclosed to the plaintiff by Dr. Pomiro and for an award of sanctions is denied.

*Conclusion*

For the reasons set forth above, I find that the privilege against self-incrimination as established by the Argentine Constitution should be recognized in this case, and I modify the Protective Order accordingly. The plaintiff's application for an order compelling the production of documents and requiring answers to interrogatories is granted in part and denied in part as described above. The plaintiff's motion to compel further discovery concerning Procida is granted. Finally, the defendants' application for an order requiring the return of documents provided to the plaintiff by Dr. Pomiro is denied.

SO ORDERED.