**Wole FAYEMI, Plaintiff,**

v.

**HAMBRECHT AND QUIST, INCORPORATED, D. Larry Smith, Roger Killion, Daniel H. Case III, Barney Hallingey, Robert Power, Tim Wilson, Rachel Leheny, Karen Kelsch, Edgar Lowe, Christina Morgan, John Doe, Robert Roe and all other members of the operating committee of Hambrecht and Quist, Incorporated, during the period July through January, 1995, Defendants.**

No. 95 Civ. 5731(LAP)(JCF).

United States District Court,
S.D. New York.

Aug. 1, 1997.

Fred P. Bennett, Ross & Bennett, Melville, NY, *for Plaintiff.*

Mark G. Cunha, Simpson Thacher & Bartlett, New York City, *for Defendants.*

### MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

This case presents two significant issues concerning discovery sanctions: first, whether a federal court has the power to sanction a party for obtaining evidence improperly outside of the litigation process; and second, whether otherwise appropriate sanctions should be withheld where the party seeking them has itself engaged in misconduct.

These questions arise in the context of an employment discrimination case. The plaintiff, Wole Fayemi, alleges that he was terminated from his job as a stock analyst at the firm of Hambrecht and Quist, Incorporated ("H & Q") on the basis of race, national origin, and disability. On the weekend immediately after his dismissal, Mr. Fayemi entered H & Q's offices and obtained information about employee bonuses from the computer files of his supervisor, D. Larry Smith. The defendants contend that this constituted theft, and they now move pursuant to Rule 26(c) of the Federal Rules of Civil Procedure for dismissal of the complaint or, in the alternative, for an order precluding the plaintiff from utilizing the stolen information in this litigation. A hearing was held on July 2, 1997, and the following findings are based on the evidence presented there.

### Background

Mr. Fayemi began working for H & Q in September 1991 as a research assistant at an annual salary of approximately $28,000. (Tr.

51).[1] He progressed through the ranks until he became a senior biotechnology analyst in H & Q's life sciences group. (Tr. 117). By the time of his termination in September 1994, he was receiving an annual salary of $90,000 as well as semiannual bonuses that equalled or exceeded that amount. (Tr. 46, 117–18).

In late July or early August 1994, Mr. Fayemi took a leave of absence from H & Q, indicating that he was going to receive treatment for depression. (Tr. 57–59, 116). Prior to his departure, Mr. Fayemi met with Mr. Smith to discuss the temporary reassignment of the stocks for which the plaintiff was responsible.

When Mr. Fayemi returned from leave on September 9, 1994, he again met with Mr. Smith. At this meeting, Mr. Smith indicated that the plaintiff's annual salary would be reduced to $75,000, that he would receive no bonus in October 1994, and that the stocks he had previously covered would be permanently reassigned. (Tr. 61–63). According to Mr. Fayemi, Mr. Smith also required him to satisfy a number of conditions before returning to work, including repaying $30,000 previously advanced or loaned to him by H & Q, paying an outstanding corporate credit card bill, and agreeing to conform to a specific work schedule. (Tr. 121–23). The meeting became contentious, and Mr. Smith told Mr. Fayemi not to report to work the following Monday. (Tr. 122–23, 127). Ultimately, no agreement was reached on terms under which Mr. Fayemi could return to work, and he commenced the instant action against H & Q and several of its officers.

In his complaint, Mr. Fayemi alleges that he was wrongfully terminated on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and related federal and state civil rights laws. He further contends that he was dismissed because of a disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654. In addition, the plaintiff asserts that the defendants awarded him a bonus of $220,000 in April

1994 for work performed prior to that date, but deferred payment of one-half of that amount to the following October. (Tr. 117–18). Thus, according to Mr. Fayemi, he was deprived of compensation he had already earned when he was terminated without any October bonus.

The defendants contend that Mr. Fayemi was fired for cause since his performance had deteriorated due to drug abuse and a sexual addiction disorder. Affidavit of D. Larry Smith dated April 4, 1997, Exhs. C, D, E, F. They deny that any bonus money due to the plaintiff in April 1994 was "deferred" to the following October. (Tr. 45–47). Moreover, the defendants argue that bonuses at H & Q were discretionary and almost never guaranteed. (Tr. 34).

During the course of discovery, Mr. Fayemi produced three documents that H & Q recognized as having come from its own internal files. Def. Exh. 1, 2, 3. These documents reflect salaries and bonuses of analysts in H & Q's life sciences group, and so are relevant to Mr. Fayemi's claim for damages, including his argument that he was denied a previously earned bonus. It is undisputed that the plaintiff obtained these documents without permission by entering Mr. Smith's office on Sunday morning, September 11, 1994, and printing the information from Mr. Smith's computer. (Tr. 96–99). Accordingly, the defendants argue that the plaintiff should be sanctioned for having stolen the documents.

Mr. Smith testified that the documents were bonus projections that he prepared and updated periodically prior to making final recommendations concerning the semiannual analyst bonuses to H & Q's chief executive officer. (Tr. 9–12, 15–20, 28–29, 33). According to Mr. Smith, this information was highly confidential, since its disclosure within the life sciences group could cause jealousy and conflict among the analysts, while its release to competitors would assist them in hiring away members of H & Q's staff. (Tr. 20–21). For these reasons, Mr. Smith never showed the documents in question to any analyst and never discussed one analyst's

---

1. "Tr." refers to the transcript of the evidentiary hearing.

salary or bonus with another. (Tr. 27). In order to ensure confidentiality, Mr. Smith kept the information on a floppy computer disk in his desk. (Tr. 21). He did not transfer the information to his computer's hard drive, however, because had he done so, it could have been retrieved by others through the office computer network. (Tr. 22–23). Further, it was Mr. Smith's practice to lock both his desk and his office door when he was not in the office. (Tr. 22, 25).

Mr. Fayemi's testimony is at odds with Mr. Smith's. The plaintiff testified that when he met with Mr. Smith to discuss his April 1994 bonus, Mr. Smith reviewed in detail with him the salary and bonus document identified in the evidentiary hearing as Defendants' Exhibit 2. (Tr. 118–19). Mr. Smith denies that this ever took place. (Tr. 46). The plaintiff also stated that when he entered Mr. Smith's office on September 11, 1994, neither the office door nor the desk were locked, and he retrieved the information in question from the hard drive on Mr. Smith's computer, not from a floppy disk. (Tr. 134–35).

Mr. Fayemi explained that he copied the bonus information because he was afraid that it would otherwise be destroyed. This fear arose from two incidents. First, when Mr. Fayemi argued that his performance was excellent and thus could not be the basis for terminating him, Mr. Smith purportedly replied that relevant records could be altered or destroyed:

> [H]e said well, it's your word against mine, and there's no way that you can prove this, you know, I have the data, you can't come back here, you can't substantiate any of this. And so that led me to believe that whatever was there, whether it be what was on my computer, which is why I copied my computer, or whether it was in his office, would or could be changed, and I didn't trust him. So I went back there to get a copy of it as it was that day.

(Tr. 112). Second, upon returning to H & Q on September 11, Mr. Fayemi discovered that items were missing from his own desk, including records of the commissions earned by analysts. These commissions, in turn, constituted one factor in the calculation of bonuses. (Tr. 128–33).

Mr. Smith acknowledges that he examined files in Mr. Fayemi's office while the plaintiff was on leave and removed documents from them. These documents, however, related to stocks that Mr. Fayemi had previously been responsible for and that Mr. Smith was now handling. (Tr. 87–90). The commission records that Mr. Fayemi claims were missing were not confidential documents, but were made available to all analysts on a regular basis. (Tr. 40–45, 143).

There is no dispute that the information the plaintiff copied from Mr. Smith's computer on September 11, 1994 was subsequently destroyed. In October 1994, Mr. Smith was advised by H & Q's general counsel that Mr. Fayemi intended to file suit over his termination. (Tr. 37, 81–83). However, no one requested that Mr. Smith preserve any documents, and when he left his employment at H & Q in May 1995, he discarded his files, including the one that contained the floppy disk with salary and bonus information. (Tr. 36–39, 84–85).

*Discussion*

### A. The Court's Authority

The threshold question in this case is whether a court has the authority to limit the use of evidence because of the manner in which the information was obtained outside the litigation process. In this respect, the defendants' reliance on Rule 26(c) of the Federal Rules of Civil Procedure is misplaced. That rule authorizes a court, "[u]pon motion by a party or by the person from whom discovery is sought" to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden · or expense...." Fed.R.Civ.P. 26(c). The rule then goes on to list eight examples of protective orders, all of which limit or foreclose discovery or regulate the disclosure of information obtained in discovery. None of the enumerated examples provide a court with a basis for limiting the use of evidence obtained outside of discovery.

■ Furthermore, when the provisions concerning protective orders were trans-

ferred from Rule 30(b) to Rule 26(c) in 1970, the advisory committee noted that "[t]he language has been changed to give it application to discovery generally." Fed.R.Civ.P. 26(c) advisory committee's note. "Rule 26, . . . which is entitled 'General Provisions Governing Discovery,' is not a blanket authorization for the court to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's process." *Bridge C.A.T. Scan Associates v. Technicare Corp.,* 710 F.2d 940, 944–45 (2d Cir.1983). Thus, "[t]he provision for protective orders in Rule 26(c) is plainly limited in its application to protection from abuses flowing from the employment of the discovery rules." 4 *Moore's Federal Practice* ¶ 26.78 at 26–503 to 26–504 (1987).

Language in some cases suggests that there may be no basis whatever for a court to exercise control over information obtained outside the discovery process. In *Kirshner v. Uniden Corp. of America,* 842 F.2d 1074 (9th Cir.1988), for example, the court held that it was inappropriate to require the return of documents purportedly subject to the attorney-client privilege which the plaintiff's attorney had acquired in discovery in separate litigation against the same defendant. *Id.* at 1076. The court concluded that "a district court's power to control discovery does not extend to material discovered in a separate action, notwithstanding the fact that the parties were identical." *Id.* at 1081. Similarly, in *Bridge,* the Second Circuit found no authority for enjoining the disclosure of the defendant's trade data that had been collected by the plaintiff's attorney prior to instituting the lawsuit. 710 F.2d at 945–46. Because the information had been "gathered independently of judicial process," the court could not exercise control over it. *Id.* at 946.

Nevertheless, courts necessarily have the inherent equitable power over their own process "to prevent abuses, oppression and injustices." *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 383, 31 L.Ed. 374 (1888); *see also International Products Corp. v. Koons,* 325 F.2d 403, 407–08 (2d Cir.1963); *Smith v. Armour Pharmaceutical Co.,* 838 F.Supp. 1573, 1578 (S.D.Fla.1993); *Schlaifer Nance & Co. v. Estate of Warhol,* 742 F.Supp. 165, 166 (S.D.N.Y.1990). Pursuant to this inherent authority, a court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct. In *Smith,* the court posed a hypothetical situation that presents the issue starkly: "Suppose a plaintiff burglarized a defendant's premises and secured privileged documents. Could one seriously contend that a court could not prohibit the use of those documents in the proceeding before it simply because the documents were not obtained through the court's discovery process?" *Smith,* 838 F.Supp. at 1578. The facts alleged by the defendants in this case closely track the *Smith* hypothetical. And, as in that case, the court here has the inherent authority to sanction a party who attempts to use in litigation material improperly obtained outside the discovery process. *See Adams v. Shell Oil Co. (In re Shell Oil Refinery),* 143 F.R.D. 105, 109 (E.D.La.1992) (inherent power allows court to exercise control over documents obtained outside discovery; no such authority under Rule 26), *amended by* No. 88 Civ. 1935, 1992 WL 275426 (E.D.La. Sept.29, 1992).

The *Kirshner* and *Bridge* cases can be reconciled with this principle. In *Schlaifer Nance,* the court characterized *Bridge* as holding that "[n]either the Federal Rules of Civil Procedure nor courts' inherent powers support an order prohibiting use of information *innocently* obtained from third parties without use of judicial process." *Schlaifer Nance,* 742 F.Supp. at 166 (emphasis added). Indeed, the court in *Bridge* specifically found that the party seeking the protective order had presented no evidence that its adversary had obtained the information wrongfully. *Bridge,* 710 F.2d at 946–47. Similarly, in *Kirshner,* the plaintiff had engaged in no wrongdoing, but had simply secured the contested documents through discovery in another case. *Kirshner,* 842 F.2d at 1076. By contrast, in this case Mr. Fayemi furtively removed confidential information from a

computer disk that his supervisor had kept secured in his desk drawer. This conduct was hardly innocent and so is an appropriate subject for sanctions.

The *Bridge* case is further distinguishable from the instant action because it implicated First Amendment concerns. There, the protective order initially obtained by the defendant precluded disclosure outside the litigation of information that had been obtained independent of discovery, and it therefore threatened to infringe the plaintiff's free speech rights. *Bridge*, 710 F.2d at 945–46. Here, the defendants seek only dismissal of the complaint or an order precluding use of the information in this litigation, and First Amendment principles are therefore not in issue.

■ Rule 26(c), then, does not provide authority for regulating the use of information obtained by a party independent of the discovery process. A court may, however, exercise its inherent equitable powers to sanction a party that seeks to use in litigation evidence that was wrongfully obtained.

### B. *Appropriate Sanctions*

■ A court considering the appropriate sanction to impose on a party that has wrongfully obtained evidence should weigh two factors: the severity of the wrongdoing and the prejudice to the adversary. The severity of the party's conduct is significant because the sanction should be designed to deter similar acts in the future both by that party and by others. *Cf. National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976) (discovery sanctions under Rule 37 serve both specific and general deterrent purposes). Matching the sanction to any prejudice suffered by the adversary is important because the party's wrongful acquisition of evidence should not be permitted to redound to its benefit in the litigation.

■ In this case, the defendants request that the complaint be dismissed. They rely in large measure on the decision of the New York Court of Appeals in *Lipin v. Bender*, 84 N.Y.2d 562, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (1994). During the course of a pretrial conference in *Lipin*, the plaintiff systematically removed from counsel table a stack of papers belonging to the defendant's attorney, read them, and later provided a copy to her attorney. *Id.* at 566–67, 620 N.Y.S.2d at 744–45, 644 N.E.2d at 1300–01. The documents were confidential, and included materials protected from disclosure by the attorney-client privilege and the work product doctrine. *Id.* at 570, 620 N.Y.S.2d at 747, 644 N.E.2d at 1303. Shortly after receiving the papers from his client, the plaintiff's attorney demanded a substantial settlement from the defendants based on the supposedly damning information they contained. *Id.* at 567, 620 N.Y.S.2d at 745, 644 N.E.2d at 1301. When this activity came to light, the trial court dismissed the complaint because of the plaintiff's misconduct. The Court of Appeals upheld this sanction, finding that "[t]here is no question that plaintiff knowingly and deliberately intruded herself into plainly private communications between defendants and their attorney, and by retaining and hand-copying the documents preserved the information gleaned for maximum advantage to herself (and maximum disadvantage to defendants) in the litigation." *Id.* at 572, 620 N.Y.S.2d at 748, 644 N.E.2d at 1304.

Mr. Fayemi's conduct in this case was clearly wrongful. While I doubt that he actually broke into Mr. Smith's office or desk, he did gain access to these private areas without permission or authority and copied confidential materials. Mr. Fayemi's suggestion that he had standing permission to enter his former supervisor's office and access the computer is unfounded. Furthermore, Mr. Fayemi's testimony that Mr. Smith had previously shared with him information about his own projected bonus and those of other analysts is wholly incredible. As Mr. Smith stated, such a practice would invite chaos among staff members competing for a piece of the bonus pool. Accordingly, Mr. Fayemi's conduct was sufficiently serious to warrant a significant sanction.

■ However, dismissal with prejudice is a "drastic remedy that should be imposed only in extreme circumstances." *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir.1986); *see also Quiles v. Beth Israel Medical Cen-*

*ter,* 168 F.R.D. 15, 18 (S.D.N.Y.1996). Here there is little, if any, continuing prejudice to the defendants. This is not a case like *Lipin* where the disclosure of privileged material provided the wrongdoer with information that she would not have otherwise obtained and could not be "unlearned." *Lipin,* 84 N.Y.2d at 572–73, 620 N.Y.S.2d at 748, 644 N.E.2d at 1304–05. On the contrary, the bonus data, though confidential, would certainly have been subject to disclosure during the normal course of discovery. Accordingly, there is no prejudice to the defendants sufficient to warrant dismissal. *See Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 683 (S.D.N.Y.1995) (employment discrimination plaintiff's damages not limited despite misappropriation of defendant's documents where they consisted of nonprivileged materials available in discovery).

The alternative remedy sought by the defendants is an order precluding the plaintiff from using in this litigation the bonus information wrongfully obtained. This sanction is more appropriate. It would prevent the plaintiff from benefitting from his wrongdoing and it is sufficient to ameliorate any prejudice to the defendants. Accordingly, an order of preclusion is the proper remedy.

### C. *Unclean Hands*

■ The final issue is whether the Court should withhold any sanction because of the defendants' own misconduct. Because the relief sought by the defendant is equitable, the unclean hands doctrine applies. Pursuant to that doctrine, a party will be denied equitable relief where it has itself acted unconscionably in relation to the matter at issue to the detriment of the other party. *See Estate of Lennon v. Screen Creations, Ltd.,* 939 F.Supp. 287, 293 (S.D.N.Y.1996).

■ Mr. Fayemi first argues that H & Q should be disqualified from any relief because Mr. Smith and others removed items, including commission records, from his desk while the plaintiff was on medical leave. This contention is without merit. To the extent that H & Q employees retrieved materials from Mr. Fayemi's work space relating to stocks that they were now following, their

conduct was hardly unconscionable. There is not sufficient evidence that Mr. Fayemi's commission records disappeared, and there is no proof whatsoever that they were taken by someone acting on behalf of the defendants. In any event, the commission records were not confidential, and their removal would not be comparable to the plaintiff's theft of the highly sensitive salary and bonus information.

■ Far more serious was Mr. Smith's subsequent destruction of the bonus data itself which, unbeknownst to him, Mr. Fayemi had already copied. H & Q was obligated to preserve evidence potentially relevant to Mr. Fayemi's claims beginning in October 1994, since he indicated at that time an intention to sue. *See Hansen v. Dean Witter Reynolds, Inc.,* 887 F.Supp. 669, 675 (S.D.N.Y.1995); *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 73 (S.D.N.Y.1991); *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 550–51 & n. 14 (D.Minn.1989). Moreover, once H & Q's general counsel was on notice of Mr. Fayemi's potential claim, he should have explained the obligation to retain pertinent documents to the relevant corporate employees, including the plaintiff's former supervisor, Mr. Smith. *See Turner,* 142 F.R.D. at 73; *Kansas–Nebraska Natural Gas Co. v. Marathon Oil Co.,* 109 F.R.D. 12, 18 & n. * (D.Neb.1983). Since Mr. Smith's salary and bonus files were plainly relevant to Mr. Fayemi's probable claims, they should have been maintained. Instead, because Mr. Smith was not properly advised of the requirements to preserve evidence, he discarded these materials.

■ H & Q's conduct in this regard was improper. Had Mr. Fayemi not copied the bonus information, he would have been wrongfully deprived of that evidence in this litigation. "[C]ourts apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). This is such a case. The Court will not exercise its equita-

ble powers to preclude the use of information improperly obtained where the party seeking the order destroyed the evidence or failed to take the steps required for its preservation.

*Conclusion*

For the reasons set forth above, the defendants' motion to dismiss the complaint or to preclude the use in this litigation of the bonus information misappropriated by Mr. Fayemi is denied.

SO ORDERED.