Nicole C. NICEFORO, Plaintiff,

v.

**UBS GLOBAL ASSET MANAGEMENT AMERICAS, INC., Defendant.**

**Nos. 12 Civ. 0033(KPF)(FM), 12 Civ. 4830(KPF)(FM).**

United States District Court, S.D. New York.

Signed May 16, 2014.

Neil H. Greenberg, Sr., Justin Marc Reilly, Neil H. Greenberg & Associates, P.C., Westbury, NY, for Plaintiff.

Thomas Anton Linthorst, Ashley Jean Hale, Richard Jasaitis Hamilton, III, Morgan Lewis & Bockius LLP, Princeton, NJ, for Defendant.

### ORDER

FRANK MAAS, United States Magistrate Judge.

In these companion actions, plaintiff Nicole Niceforo ("Niceforo") alleges that UBS Global Asset Management Americas, Inc. ("UBS") compensated her improperly under the Fair Labor Standards Act ("FLSA") and fired her for exercising her rights under the Family Medical Leave Act ("FMLA") and Americans with Disabilities Act ("ADA"). Currently before the Court is Niceforo's motion to preclude UBS from using for any purpose a notebook found in her desk after her termination. (12 Civ. 4830, ECF No. 26).

Niceforo maintains that the notebook belonged to her and that the manner in which UBS obtained it constitutes conversion and larceny. She further alleges that the notebook contains privileged attorney-client communications. UBS counters that the notebook cannot be considered Niceforo's personal property because it was located within her UBS work space, and that even if it was, UBS obtained it properly. UBS further contends, *inter alia*, that Niceforo waived any claim of privilege due to her delay in seeking the notebook's return. As explained below, UBS did not obtain the notebook improperly. Additionally, Niceforo has failed to establish and also has waived any claim of privilege with respect to its contents. Niceforo's motion to preclude therefore is denied.

### I. *Background*

Niceforo began her employment with UBS in 2007. (Pl.'s Ex. B ("Niceforo Dep.") at 31).[1] While employed with UBS, Niceforo worked at a cubicle in an open work space. (Declaration of Thomas A. Linthorst, dated March 7, 2014 ("Linthorst Decl.") (filed under seal), Ex. 27). On or about July 13, 2011, Niceforo went on a medical leave from which she returned on October 3, 2011. (Pl.'s Ex. C ("Kishimoto Dep.") at 118–19). UBS put Niceforo "on probation" on October 6, 2011, and gave her a "final warning" six days later. (Pl.'s Exs. A ("Foglia Dep.") at 265, E). Then, on October 20, 2011, Niceforo's manager, Marilyn Foglia ("Foglia") and a representative from the Human Resources Department, Mika Kishimoto ("Kishimoto"), summoned Niceforo to a conference room at UBS and terminated her employment. Niceforo was not permitted to return to her desk. (Kishimoto Dep. at 238–39). Instead, Foglia and Kishimoto asked Niceforo what personal belongings she would need in order to leave. Niceforo asked for her bag and shoes, and possibly her coat, which Foglia retrieved. (Foglia Dep. at 303). Niceforo also requested food items from the office refrigerator which were provided. (Linthorst Decl. Ex. 9 at 240). She then was escorted from the building. (*See* Foglia Dep. at 302).

Earlier in 2009, Niceforo began keeping a "log" in response to complaints about her work. (Linthorst Decl. Ex. 3 at 99–101). She generally wrote down her arrival and departure time and made notes regarding projects. (*Id.*). The notebook that is the subject of her motion constitutes the last of the logs. (*Id.* at 229).

When Niceforo arrived home after her termination, she noticed that the notebook

1. "Pl.'s Ex." refers to the exhibits submitted in connection with the Plaintiff's memorandum of law. (12 Civ. 4830, ECF No. 27).

was not among her belongings. (*Id.* at 238). Over the following days, UBS staff collected other personal items from Niceforo's desk and sent them to her. (*See* Foglia Dep. at 304; Kishimoto Dep. at 242). The notebook was not in those shipments either. (Linthorst Decl. Ex. 3 at 241).

In late October or early November, UBS assigned Alex Severis ("Severis"), an intern, to work at Niceforo's former work station. (*See* Foglia Dep. at 305–06). In or around November 2011, Severis found the notebook in a desk drawer. (Linthorst Decl. Ex. 12). After Foglia returned to the office, Severis gave the notebook to her. (*Id.*). Foglia then turned the notebook over to Kishimoto. (Pl.'s Ex. I ("Second Kishimoto Dep.") at 2; *see* Foglia Dep. at 307). Kishimoto knew that litigation involving Niceforo was pending, so she provided the notebook to UBS's in-house counsel, Jenny Stuart. (Second Kishimoto Dep. at 8). The original notebook remained in the possession of UBS's counsel until January 2013. (Pl.'s Ex. J at 5).

On July 12, 2012, UBS made its first document production in the FLSA litigation, in which it included a copy of the notebook. (Linthorst Decl. ¶ 16). Niceforo, however, first reviewed those documents after UBS made its first document production in the ADA/FMLA case on December 21, 2012. (Pl.'s Mem. at 5).

Niceforo's counsel wrote two letters to UBS soon after her dismissal which made no mention of the notebook. In the first such letter, sent in October, counsel informed UBS that, absent a response from UBS, they would "proceed formally with [Niceforo's] claims at the agency level so as to satisfy the prerequisite for federal court." (Linthorst Decl. Ex. 7). Although counsel cautioned UBS to "retain all documents relevant to this action in anticipation of such suit," there was no request for

the return of the notebook. (*Id.* at 3). A second letter in December 2011 also failed to request the notebook's return. (*Id.* Ex. 10). Indeed, it was not until January 8, 2013, that counsel asked for the first time that the notebook be returned. (*Id.* Ex. 15). By letter dated January 17, 2013, UBS stated that it was returning the notebook under separate cover although it claimed that it had "no obligation to do so." (Linthorst Decl. Ex. 16). UBS nevertheless retained a copy of the notebook. (Def.'s Mem. at 8).

## II. *Discussion*

### A. *Legality of UBS's Acquisition of the Notebook*

A court has the "inherent authority to sanction a party who attempts to use in litigation material improperly obtained outside the discovery process." *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y.1997). Before exercising this authority, however, the Court must find that the material was obtained improperly. Courts will not preclude the use of evidence procured outside of normal channels without any indication of wrongdoing. *See id.* at 324–25; *Schlaifer Nance & Co. v. Estate of Warhol*, 742 F.Supp. 165, 166 (S.D.N.Y.1990) ("Neither the Federal Rules of Civil Procedure nor courts' inherent powers support an order prohibiting use of information *innocently* obtained from third parties without use of judicial process.") (emphasis added). Niceforo claims that she is entitled to preclusion because the manner in which UBS obtained her notebook constitutes both conversion and larceny. Neither contention withstands scrutiny.

#### 1. *Conversion*

Under New York law, "[c]onversion is the 'unauthorized assumption and exercise of the right of ownership over

goods belonging to another to the exclusion of the owner's rights.' " *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (quoting *Empl'rs' Fire Ins. Co. v. Cotten,* 245 N.Y. 102, 105, 156 N.E. 629 (1927)). A plaintiff must plead two key elements to establish a conversion claim: "[a] [the] plaintiff's possessory right or interest in the property and [b] [the] defendant's dominion over the property.or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network, Inc.,* 8 N.Y.3d 43, 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006) (internal citations omitted). Fault need not be shown. *Cruz v. TD Bank, N.A.,* 855 F.Supp.2d 157, 174 (S.D.N.Y.2012) (citing *LoPresti v. Terwilliger,* 126 F.3d 34, 42 (2d Cir.1997)). If the converter acquires the property lawfully at the outset, " 'a conversion does not occur until the defendant refuses to return the property after demand.' " *Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir.1993) (quoting *Johnson v. Gumer,* 94 A.D.2d 955, 464 N.Y.S.2d 318, 319 (4th Dep't 1983)).

It is undisputed that Niceforo voluntarily brought the notebook into the workplace and did not make any demand for its return until January 8, 2013, more than one year after her termination and six months after UBS had produced a copy of it to her as a part of its first document disclosure. Once Niceforo requested the original notebook, UBS promptly complied. UBS therefore acquired the property lawfully at the outset because Niceforo herself brought it to UBS's offices and left it there.[2] When Niceforo finally demanded the return of the notebook through counsel, UBS did not refuse her request. It follows that no conversion occurred.

### 2. *Larceny*

Under New York law, larceny "includes a wrongful taking, obtaining or withholding of another's property," with the intent to deprive the owner of that property. N.Y. Penal L. § 155.05. A person can commit the crime of larceny by exercising control over property that "he knows to have been lost or mislaid ... without taking reasonable measures to return such property to the owner." *Id.* An owner is "deprived" of property when, *inter alia,* someone "dispose[s] of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property." N.Y. Penal L. § 155.00(3)(b). The "intent to deprive" element of the crime thus cannot be satisfied simply by establishing "an intent temporarily to use property without the owner's permission, or even an intent to appropriate outright the benefits of the property's short-term use." *People v. Jennings,* 69 N.Y.2d 103, 119, 512 N.Y.S.2d 652, 504 N.E.2d 1079 (1986).

Niceforo cannot show that UBS knew prior to January 8, 2013, that she had "lost or mislaid" the notebook, since she never had made any demand for its return despite having sought the return of other personal items. There also has been no showing that UBS had any intent to deprive her of her property. Indeed, UBS's inclusion of a copy of the notebook in its first document production and return of the notebook itself to Niceforo immediately after she requested it evince precisely the opposite intent.

---

**2.** At an earlier time, Niceforo suggested that Foglia had removed the notebook from Niceforo's handbag when she retrieved the items that Niceforo said she needed to take with her on the day of her termination. (*See* 12 Civ. 33, ECF Nos. 40 at 3, 42 at 8–9). She appears to have abandoned that claim.

■ UBS also took "reasonable measures" under the circumstances. By the time UBS discovered the notebook, Niceforo's counsel had indicated that she was preparing to file suit and had cautioned UBS to "retain all documents relevant to this action in anticipation of such suit." (Linthorst Decl. Ex. 7 at 3). By turning the notebook over to its counsel, UBS merely was following Niceforo's directive. Rather than seeking to hide the notebook, UBS then produced a copy as part of its very first document production. And when Niceforo eventually demanded the return of the original, UBS promptly complied. Even if Niceforo believes that UBS should have handled the matter differently, it is clear that UBS's actions were reasonable. UBS therefore did not commit larceny.

### 3. *Violation of Privacy*

■ Although Niceforo bases her claim that UBS obtained the notebook improperly solely on her conversion and larceny theories, as UBS itself recognizes, there also is a question as to whether its actions violated Niceforo's privacy interests. (*See* Def.'s Mem. at 11). UBS asserts that Niceforo had no privacy interest in the notebook on the date of her termination because it was located within her workspace at UBS. In support of this proposition, UBS cites its "Privacy in the Workplace" policy, which warns UBS employees that:

> [A]ll materials whether maintained electronically, on paper or in any other hard-copy form that are located in any area within or on the Organization's premises, including all offices, workspaces, towers and lockers, are regarded as property of the Organization. This includes files that are marked "personal" or "private."

> To the extent that you are conducting personal business on the Organization's premises or during the workday, you should bear these considerations in mind.

(Linthorst Decl. Ex. 24). Niceforo argues that UBS "cannot hide behind" this policy because such "policy statements should not lightly be converted into binding employment agreements." (Pl.'s Mem. at 5–6 (citing *Martin v. S. Container Corp.*, 92 A.D.3d 647, 648–49, 938 N.Y.S.2d 335 (2d Dep't 2012))).

Assuming that the notebook was Niceforo's personal property, it is clear that Niceforo could not have had a reasonable expectation that the notebook would remain private. Fourth Amendment jurisprudence is instructive in this regard. In the search and seizure context, the Supreme Court has held that employees may have a reasonable expectation of privacy in their work spaces in some circumstances. *See O'Connor v. Ortega*, 480 U.S. 709, 718–19, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (doctor had reasonable expectation of privacy in desk and file cabinets that he did not share with other employees and used for seventeen years to store personal items). Some work spaces, however, "may be so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor*, 480 U.S. at 718, 107 S.Ct. 1492. Thus, a file cabinet inside a private office with a door, from which visitors may be excluded, is treated differently than a cubicle in a shared work space, which colleagues and visitors can see and enter into at a moment's notice. *See United States v. Reilly*, No. 01 Crim. 1114(RPP), 2002 WL 1163572, at *4 (S.D.N.Y. June 3, 2002) ("The fact that employees may have kept some personal items in their cubicles does not give the defendant a legitimate expectation of privacy in the cubicle."). Here, Niceforo did not work in a private office, but at a desk

in an open, shared workspace. (*See* Linthorst Decl. Ex. 27). Indeed, even she describes it as a "cubicle." (Pl.'s Reply at 4). Niceforo therefore could not have had a reasonable expectation of privacy based simply on the configuration of her work space.

Additionally, both public and private "employees' expectations of privacy in their offices, desks, and file cabinets ... may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor*, 480 U.S. at 717, 107 S.Ct. 1492. Niceforo apparently was aware of UBS's privacy policy. (*See* Linthorst Decl. ¶ 27; Ex. 24). Although she asserts that the policy "should not lightly be converted into [a] binding employment agreement[ ]," (Pl.'s Mem. at 5–6), UBS does not urge such a transformation. Rather, UBS proffers its policy simply as evidence that Niceforo could not have had a reasonable expectation that she would retain a privacy interest in a notebook that she brought to UBS's office and then abandoned there for fifteen months. Niceforo was on notice that UBS had a policy that even items marked as "personal" in UBS's offices would be "regarded as property of UBS. For that reason, Niceforo cannot now argue that she had a reasonable expectation that a work journal left in a desk drawer at UBS would remain private.

■ In support of her argument that the use of the notebook should be precluded, Niceforo relies heavily on *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548 (S.D.N.Y.2008), a trade secrets case. There, the plaintiffs accessed three personal email accounts belonging to an allegedly disloyal former employee using the plaintiffs' on-site work computers. *Id.* at 552. The employee had not stored any of the contested emails on his work computer prior to his departure, but the plaintiffs utilized the automatically-saved passwords for one such account to access it, and then used passwords found through that means to access the two other accounts. *Id.* at 552, 559–60. On these facts, the court concluded that the plaintiffs' actions violated the Secured Communications Act. The court further found that the employee had a reasonable expectation of privacy in his password-protected email accounts, which could only be accessed with his authorization, and that his carelessness in leaving his email account passwords saved in the work computer did not equate to authorization. As the court observed:

> If [the employee] had left a key to his house on the front desk at [work], one could not reasonably argue that he was giving consent to whoever found the key, to use it to enter his house and rummage through his belongings. And, to take the analogy a step further, had the person rummaging through the belongings in [the employee's] house found the key to [his] country house, could that be taken as authorization to search his country house[?] We think not.

*Id.* at 561. To the extent *Pure Power* is applicable to the facts of this case, the notebook is analogous to the house key, not the email accounts. Niceforo left the notebook in a non-private place, where it was available for others to view. It therefore was not unreasonable for UBS to examine it. Furthermore, even if the Court were to assume that Niceforo had an expectation of privacy in the notebook during her employment at UBS, she forfeited her privacy claim by abandoning the notebook at UBS' office for fifteen months before making her first demand for its return. *See United States v. Torres*, 949 F.2d 606, 608 (2d Cir.1991) ("It is well settled that an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when ac-

tions or statements disavow any expectation of privacy.").

In sum, Niceforo has not shown wrongdoing on the part of UBS in obtaining the notebook. She also abandoned any privacy claim by failing to act with reasonable dispatch. Accordingly, there is no reason to preclude the use of the notebook.

### B. *Privilege*

#### 1. *Attorney–Client Communications*

Niceforo also contends that several pages of the notebook reflect privileged attorney-client communications. (Pl.'s Mem. at 8).

The attorney-client privilege applies to "communications [a] between a client and his or her attorney [b] that are intended to be, and in fact were, kept confidential [c] for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir.2011). The purpose of the privilege is to "encourage clients to make full disclosure to their attorneys" in order to ensure the quality of subsequent legal advice. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). By shielding attorney-client communications against disclosure, however, the privilege often forecloses parties from obtaining relevant evidence that they otherwise could obtain through discovery. For that reason, the privilege is "narrowly" construed and applied " 'only where necessary to achieve its purpose.' " *In re County of Erie*, 473 F.3d 413, 418 (2d Cir.2007) (quoting *Fisher*, 425 U.S. at 403, 96 S.Ct. 1569). Furthermore, "[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997).

■ The only support for Niceforo's privilege claim is a statement in her memorandum of law that several pages of the notebook "contain[ ] attorney-client communications between the plaintiff and her attorney." (Pl.'s Mem. at 8). Tellingly, Niceforo has not submitted any admissible evidence to support that assertion. For example, there is no affidavit establishing that the notations on the disputed pages actually relate to a conversation between Niceforo and her counsel. Indeed, the only support for Niceforo's claim is her attorney's unsworn representation that she "consulted with and hired an attorney when she received the final written warning" on October 12, 2011. (*Id.*). The notebook entries at issue are dated October 12 and October 14, 2011. (Pl.'s Ex. K at 26–30). The simple fact that they may have been made around the time that Niceforo claims to have retained counsel, however, does not establish that the notations are, in fact, attorney-client communications.

■ Furthermore, even if the notations did reflect some conversations between Niceforo and her attorney, there is no basis on which the Court could conclude that they were made "for the purpose of obtaining or providing legal advice." *Mejia*, 655 F.3d at 132.

■ Finally, there is no evidence that Niceforo made a reasonable attempt to keep these statements confidential. As previously discussed, Niceforo was on notice of UBS's privacy policy. Her decision to record her communications with counsel in a notebook kept in her desk drawer, combined with her failure to seek the notebook's return for more than a year, destroys any claim that she intended to keep the communications confidential.

Accordingly, Niceforo has failed to establish that any privilege exists as to the contents of the notebook.

### 2. *Waiver of Attorney–Client Privilege*

■ Even were the Court to find that some of the contents of the notebook were privileged, Niceforo's motion still would have to be denied because she has waived any claim of privilege by delaying her attempts to seek the return of the notebook.

A party seeking the protections of the attorney-client privilege must affirmatively act to protect her communications. *Hollis v. O'Driscoll*, 13 Civ.1955(AJN), 2013 WL 2896860, at *2 (S.D.N.Y. June 11, 2013) (citing *In re von Bulow*, 828 F.2d 94, 101 (2d Cir.1987) ("[I]t is the client's responsibility to insure continued confidentiality of his communications."); *In re Horowitz*, 482 F.2d 72, 82 (2d Cir.1973) ("It is not asking too much to insist that if a client wishes to preserve the privilege ..., he must take some affirmative action to preserve confidentiality."); *Pure Power*, 587 F.Supp.2d at 563 ("[A] party who seeks to uphold the privilege must take affirmative measures to maintain the confidentiality of attorney-client communications.")). Here, Niceforo failed to take any affirmative action to seek the return of her notebook for more than fifteen months after she left it at UBS. She had several opportunities to request its return, including on the day of her termination and in the two letters that her counsel sent to UBS. (*See* Linthorst Decl. Exs. 7, 10). Niceforo admitted in her deposition that she did not see the notebook among her personal belongings when she returned home from UBS on the day of her termination, and that it was not in the set of belongings that UBS later shipped to her. (*See* Niceforo Dep. at 238–41). Nevertheless, she did not make any demand for the notebook at that time. Niceforo claims that she failed to make a demand because the "journal wasn't the highest priority on my list at the time." (Linthorst Decl. Ex. 3 at 244). Even after UBS furnished a copy of the notebook to her counsel, however, Niceforo waited almost six months to make any claim regarding the notebook. Even then, when Niceforo finally demanded the notebook's return, she still did not assert a claim of attorney-client privilege with respect to its contents. It was not until July 23, 2013, when Niceforo's counsel wrote to the court that Niceforo mentioned the privilege for the first time. (Linthorst Decl. Ex. 21).

When a party "voluntarily undertakes actions that will predictably lead to the disclosure" of privileged communications, "waiver will follow." *Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 479 (S.D.N.Y.1993) (citing *In re von Bulow*, 828 F.2d at 100–01). Having other more pressing priorities does not excuse such actions. Niceforo voluntarily placed the notebook in UBS's offices, and then failed to make a demand for its return for fifteen months. Even when she made that demand, she did not assert a claim of privilege for another six months. Through this nearly two-year delay, Niceforo waived any privilege she might otherwise have claimed regarding the contents of the notebook. *See, e.g.*, Fed.R.Evid. 502(b) (inadvertent disclosure does not constitute waiver where privilege-holder *"promptly* took reasonable steps to rectify the error" (emphasis added)); *Clarke v. J.P. Morgan Chase & Co.*, 08 Civ. 2400(CM)(DF), 2009 WL 970940, at *6 (S.D.N.Y. Apr. 10, 2009) (delay of two months in asserting claim of privilege constitutes a "sufficiently long period of time to warrant a finding of waiver").

### III. *Conclusion*

For the foregoing reasons, Niceforo's motion to preclude (12 Civ. 4830, ECF No. 26) is denied. Additionally, because the majority, if not all, of the Linthorst Declaration does not appear to contain any privileged matter, defense counsel is directed

to file an unredacted copy of it after conferring with opposing counsel.

SO ORDERED.